**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| HARBORWALK, LP; | § | Case No. 10-80043 |
| HARBORWALK MARINA OPERATING | § | Case No. 10-80044 |
| COMPANY, LTD.; | § | |
| HARBORWALK SALES CORPORATION | § | Case No. 10-80045 |
| | § | |
| DEBTORS. | § | JOINT ADMINISTRATION |
| | § | REQUESTED |

**EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364 AND BANKRUPTCY RULES 2002, 4001, AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING, (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) SCHEDULING FINAL HEARING**

The above-captioned debtors and debtors-in-possession (together, the "Debtors"), by and through their undersigned proposed attorneys, hereby file this motion (the "Motion") for an order (the "DIP Order"), pursuant to Bankruptcy Code §§ 105, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014, and for entry of an order authorizing the Debtors to, among other things, (a) obtain post-petition financing of up to $2.5 million in principal (plus a Commitment Fee (defined below) and certain costs) and (b) grant adequate protection in the form of security interests and superpriority claims in connection therewith. In support thereof, the Debtors would show as follows:

**I.  JURISDICTION**

1. This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Bankruptcy Rules 2002, 4001, and 9014.

HOUSTON\2351816

## II.  RELEVANT BACKGROUND

**Business Description**

2. On January 25, 2010 (the "Petition Date"), the Debtors Harborwalk, LP, Harborwalk Sales Corporation ("Harborwalk Sales"), and Harborwalk Marina Operating Company, Ltd. ("Harborwalk Operating") filed voluntary petitions for relief under chapter 11, Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Galveston Division (the "Court").  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are operating their businesses and managing their property as debtors-in-possession.  No trustees or examiners have been appointed in these cases.

3. With their original petitions, the Debtors contemporaneously filed a Notice of Designation as Complex Chapter 11 Bankruptcy Case.

4. The Debtors are engaged primarily in the business of developing and selling luxury residential real property (as a master-planned community) consisting of approximately 625 acres on the north shore of West Galveston Bay in Galveston County, Texas (the "Harborwalk Property" or the "Project").  The Harborwalk Property now offers luxury waterfront living and is composed of approximately 380 residential lots, a 150-slip marina, and a yacht club. The Debtors sell vacant lots to builders and individual buyers.  Because the Project offers many recreational opportunities, it is particularly attractive to prospective buyers in the market for second homes.

5. Harborwalk, LP is a limited partnership, with Harborwalk GP, LLC[1], a non-debtor, holding 1% as the general partner, and Harborwalk Investments, LLP[2], a non-debtor,

---

[1] Harborwalk GP, LLC is wholly owned by Harborwalk Investments, LLP.  *See* footnote 2, *infra*.

holding 99% as limited partner. Harborwalk LP owns the club, store, and marina at the Harborwalk Property.

6. Harborwalk Sales is a wholly-owned subsidiary of Harborwalk, LP. Harborwalk Sales holds a license with the Texas Real Estate Commission and operates the developer sales and re-sales operation.

7. Harborwalk Operating is a limited partnership with Harborwalk Marina GP, LLC[3], a non-debtor, holding 1% as the general partner, and Harborwalk LP holding 99% as the limited partner. Harborwalk Operating operates the yacht club, store, and marina located on the Property. Harborwalk LP owns these facilities and is obligated to make all cash contributions.

8. Harborwalk LP was formed in 2002 to develop the Harborwalk Property, and it obtained a $12 million development loan (the "Development Loan") from Riverway Bank to begin funding the Project. The Development Loan is secured by the Harborwalk Property. From 2002 to 2007, the development of the Harborwalk Property proceeded generally in accordance with the plan and expectations of Harborwalk, LP. During this time, the development was modified on three occasions as Harborwalk, LP opened additional sections of the Harborwalk Property. In 2006, the Development Loan was extended to $30 million. During this period, Riverway Bank was acquired by Texas State Bank, which in turn was acquired in December 2007, by the Spanish bank holding company BBVA. BBVA has since begun operating as BBVA Compass ("Compass").

9. Approximately 380 lots in the Harborwalk Property have been completed and approximately 275 lots in the Harborwalk Property have been sold since the Project's inception. However, in 2007 the real estate market began to suffer, and in 2008, lot sales slowed drastically.

---

[2] Harborwalk Investments, LLP is a general partnership electing to operate as a limited liability partnership with sixteen (16) partners.
[3] Harborwalk Marina GP, LLC is a limited liability company owned by Lynn, Evan, Alan, and Amy Watkins.

At the same time, the Harborwalk, LP continued to incur expenses in connection with building a yacht club and marina on the Harborwalk Property. The costs of these improvements coupled with low sales made it necessary for Harborwalk, LP to draw down all of the funds under the Development Loan.

10. In anticipation of a long-term depression of real estate prices and demand, Harbowalk, LP and Compass reached an agreement whereby Harborwalk LP would contribute $10 million in equity to be used to reduce the principal amount of the Development Loan to $20 million. In consideration of this equity contribution and pay-down, Harborwalk, LP requested that Compass (i) extend the Development Loan for five years; (ii) reduce the interest rate; and (iii) allow Harborwalk, LP to make draws on the loan up to a $30 million cap. Harborwalk, LP communicated to Compass that its willingness to make such an equity contribution was contingent on these terms. Compass accepted this offer and a refinancing on substantially these terms was close in June 2008. At that time, Compass engaged an appraiser who opined that the fair market value of the Harborwalk Property collateralizing the Development Loan was $62 million.

11. On September 10, 2008, the Harborwalk Property suffered substantial damage as a result of Hurricane Ike striking the Houston-Galveston area. Although the physical damage to the Harborwalk Property was quickly repaired, the effect of Hurricane Ike and the real estate exigency greatly depressed the market for the sale of the Harborwalk Property's individual lots.

12. Since the re-financing in June 2008, Harborwalk, LP has complied with all terms contained in the Development Loan documents and has drawn approximately $7 million of the

HOUSTON\2351816                                 4

$10 million available. All of these draws have been approved by Compass and the last draw was funded on December 4, 2009.[4]

13. However, when Harborwalk, LP submitted a draw on December 7, 2009, Compass refused to fund the draw based on Compass' allegation that a "material adverse change" had occurred and that the Development Loan was in default because the Harborwalk Property had allegedly drastically declined in value since the refinancing in 2008.[5]

14. As a result of Compass' refusal to fund the draw request, Harborwalk, LP has been forced to discontinue the bulk of the operations with regard to the Harborwalk Property. On January 7, 2010, Harborwalk filed a complaint against Compass in the District Court of Galveston County, 10th Judicial District, Cause No. #10-CV-0023 (the "Compass Lawsuit"). As part of the Compass Lawsuit, Harborwalk, LP has asserted causes of action against Compass for breach of contract, breach of fiduciary duty and duty of good faith, fraud, and negligent misrepresentation. Harborwalk, LP is seeking the recovery of all actual damages, punitive damages, interest, and attorneys' fees to the extent allowed by law. Additionally, Harborwalk, LP is seeking cancellation of its debt and rescission of the Development Loan agreement as equitable remedies.

15. Compass' refusal to fund the Development Loan pursuant to its 2008 terms has forced the Debtors to file for bankruptcy protection in order to obtain, through DIP Financing, the funds they need to continue operations and successfully emerge as reorganized entities.

---

[4] During the course of the development of the Harborwalk Property, Harborwalk, LP has advanced funds to Hitchcock TIRZ #1 and Flamingo Isles MUD of Galveston County to which it is entitled to reimbursement pursuant to certain terms and conditions. As of January 7, 2010, the amount owed to Harborwalk, LP as reimbursement for the advances is $7.4 million and $19.3 million, respectively (these are face value amounts (i.e. not necessarily present value) and do not include accrued interest). The rights to these reimbursements are collaterally assigned to Compass as additional security for the Development Loan.

[5] The appraisal relied upon by Compass was performed by CB Richard Ellis and is dated September 21, 2009. The appraisal opined that the value of the remaining parcels of the Harborwalk Property owned by Harborwalk, LP was $25.2 million. The appraisal expressly excludes more than $26.7 million in receivables due and owing from TIRZ and MUD that are described in footnote 4, *supra*.

**Material Terms of the Proposed Post-Petition Financing**

16. Prior to the Petition Date, the Debtors communicated with several lenders with initial interest in providing post-petition financing. The Debtors eventually entered into substantive discussions with Klein Equities, LLC (the "DIP Lender") to obtain financing in the aggregate amount of $2.5 million (the "DIP Loan") under a debtor-in-possession financing facility (the "DIP Facility"), on the terms and conditions set forth in the Debtor-in-Possession Credit Agreement (the "DIP Agreement"), which is attached hereto as **Exhibit A** (the DIP Agreement together with all agreements, documents and instruments delivered or executed in connection with the DIP Facility, the "DIP Documents").

17. Bankruptcy Rule 4001 requires that motions requesting authority to incur post-petition financing begin with a concise statement of the relief requested, that summarizes the material terms and sets forth where the material terms can be found in the documents. Such summary is set forth below.[6] The Debtors believe that these terms will reasonably address their near-term financing requirements and constitute the best financing option available to them given the circumstances of their business, their capital structure, and these Chapter 11 cases.

(a) **The DIP Loan Parties and Other General Terms.** Extensions of credit under the DIP Loan will be made by (the "DIP Lender"), to each of the Debtors, as borrowers. (DIP Agreement, p. 1).

(b) **Amount of DIP Loan.** The DIP Loan shall be in the total amount of $2,500,000.00. In the interim between the Petition Date and the final hearing on the DIP Motion, the Debtors are requesting sufficient financing to pay for bankruptcy related costs and expenses as set forth in the budget (which is attached to the DIP Order as Exhibit A) in an amount estimated not to exceed $540,000.00. (DIP Agreement, p. 15).

(c) **Security.**

(i) Collateral. The DIP Lender's "Collateral" is all of the assets of the Debtors in existence prior to the Petition Date or created after the Petition Date (excluding actions for preferences, fraudulent conveyances and other avoidance power claims under sections

---

[6] This summary is qualified in its entirety by reference to the provisions of the DIP Agreement and the DIP Order.

544, 545, 546, 547, 548, 550, 552(b) and 553 of the Bankruptcy Code), and all improvements, additions and extensions thereto, all replacements thereof, all books and records with respect thereto and all products, proceeds, rents, revenues, income, offspring and profits of the foregoing.

(ii) <u>First Priority Lien on the Collateral</u>. Pursuant to Bankruptcy Code § 364(c)(2), the DIP Lender is hereby granted valid, binding, continuing, enforceable, fully-perfected first priority security interests in and liens on the Collateral that is not subject to any Pre-Petition Lien. <u>Pre-Petition Lien</u> means any (i) valid, perfected, enforceable and unavoidable lien or security interest existing as of the Petition Date or (ii) valid, enforceable and unavoidable lien or security interest in existing as of the Petition Date that is perfected subsequent to the Petition Date pursuant to sections 546 and 362(b)(18) of the Bankruptcy Code.

(iii) <u>Liens Priming Pre-Petition Liens</u>. Pursuant to Bankruptcy Code § 364(d)(1), the DIP Lender is hereby granted valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interests in and liens on the Collateral that is subject to any Pre-Petition Lien, which security interests and liens shall be senior in all respects to the Pre-Petition Liens.

(iv) <u>Carve Out</u>. The liens granted to the DIP Lender pursuant to the DIP Loan shall be subject to a carve-out for (a) the allowed fees and expenses of attorneys, accountants, financial advisors, and other professionals retained pursuant to court orders by the Debtors, their estates, or any official committee of unsecured creditors in these cases (collectively, the "<u>Estate Professionals</u>") pursuant to the Bankruptcy Code which have actually been incurred but are unpaid as of the occurrence of an Event of Default, provided that in no event shall any such fees and expenses exceed the respective amounts allocated for such Estate Professionals in the Budget for the period up to the occurrence of an Event of Default; (b) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court (the "<u>Statutory Fees</u>"), which Statutory Fees shall be included by the Debtors in the Budget; and (c) any and all allowed fees and expenses of the Estate Professionals after the occurrence of an Event of Default in an amount (exclusive of any retainers held by such Estate Professionals not funded through the DIP Facility) not to exceed $100,000.00 (the "<u>Carve-Out</u>").

(d) **Use of Proceeds.** The DIP Loan is being entered into in order to fund the operating and development expenses, capital expenditures, current interest and fees on the DIP Loan, the expenses of the administration of the chapter 11 case, and similar costs, solely in accordance with the operating budget (the "<u>Budget</u>"), which is attached to the proposed DIP Order as Exhibit A. (DIP Agreement, p. 30).

(e) **Term.** The maturity date of the DIP Loan is the earlier of (i) six (6) months from the date of such loan; (ii) the date on which any of the Debtors' cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; (iii) termination of the commitment of the DIP Lender to make DIP Loans upon an event of default; (iv) the effective date of a plan of reorganization for the Debtors; and (v) the initial funding of any loan or advance pursuant to any other debtor-in-possession financing facility. (DIP Agreement, p. 2).

(f) **Interest Rate and Default Rate.** The DIP Loan will bear interest at a base rate of twelve and one-half percent (12.5%) per annum (the "Base Rate"). After the occurrence and during the continuance of an event of default, interest of the DIP Loan will bear interest at a rate equal to seventeen and one-half percent (17.5%) per annum or the maximum rate allowed by law, whichever is less. Interest shall be payable monthly on the first day of each month. (DIP Agreement, p. 16).

(g) **Fees.** (1) Facility Fee. Debtors will pay DIP Lender a facility fee equal to one and one-half percent of the outstanding commitment (the commitment at any one time outstanding not to exceed $2,500,000). Such fee will be payable on the closing date (as defined in the DIP Agreement), will be fully earned when paid and shall be nonrefundable for any reason whatsoever;

(2) Unused Commitment Fee. Debtors will also pay the DIP Lender a unused commitment fee equal to four-tenths of one percent per month of the amount by which the average daily commitment during the period for which payment is made exceeds the average daily outstanding principal amount of the DIP Loan during such period. The unused commitment fee shall be fully earned when paid and shall be non-refundable for any reason whatsoever. (DIP Agreement, p. 17).

(h) **Representations and Warranties.** The DIP Agreement contains various representations and warranties by the Debtors (to the extent set forth therein), with respect to, among other things, their organization and existence, ability to enter into the DIP Loan and ownership of the Property. (DIP Agreement, pp. 24-27).

(i) **Covenants.** The DIP Agreement contains various affirmative and negative covenants, relating to, among others: (a) the Debtors' corporate partnership authority to enter into the DIP Loan; (b) the Debtors' ownership of the Property; (c) timely payment of obligations; (d) the DIP Lender's right to access the Property; and (e) taxes related to the Property. (DIP Agreement, pp. 28-34).

(j) **Events of Default.** Events of Default include, but are not limited to, (i) failure of the Debtors to pay any amount of principle or interest payable under the DIP Agreement; (ii) failure to perform the covenants in the DIP Agreement; (iii) the existence of a false or misleading representation or warranty under the DIP Agreement; (iv) the entry of an order staying or modifying (in any manner adverse to the DIP Lender) the effectiveness of any DIP Order without the express written consent of the DIP Lender; (v) the entry of an order dismissing the Debtors' bankruptcy cases without the DIP Lender's consent or converting the bankruptcy cases to chapter 7 cases; or (vi) the failure of the Debtors to comply in all material respects with each and all of the terms and conditions of any DIP Order. (DIP Agreement, pp. 35-38).

(k) **Remedies Upon Default.** The DIP Lender's remedies upon the occurrence of an Event of Default, shall include: (i) declaring the commitment of the DIP Lender to make DIP Loans terminated; (ii) declaring the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Agreement to be immediately due and payable, without presentment, demand, protest or

other notice of any kind; and (iii) exercising all rights and remedies available to it under the DIP Documents as provided in the DIP Orders.  (DIP Agreement, p. 38).

(l) **Costs and Expenses.**  Debtors shall bear all reasonable costs and expenses (including reasonable fees and expenses of DIP Lender's counsel, accountants and other professional advisors to the DIP Lenders) arising in connection with the preparation, execution and delivery of DIP Agreement and DIP Documents.  Debtors shall also pay all reasonable fees and expenses of financial consultants to the DIP Lender in connection with the underwriting, management and administration of the DIP Loans.  (DIP Agreement, p. 40).

(m) **Indemnity.**  Borrower shall indemnify the DIP Lender against, and hold it harmless from, any and all losses, claims, damages, liabilities and related expenses in connection with, or as a result of (i) the execution or delivery of the DIP Agreement, any other DIP Documents, the performance by the parties to the DIP Agreement of their respective obligations thereunder, or the consummation of the transactions contemplated thereby, (ii) any DIP Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by the Debtors, or any environmental liability related in any way to the Debtors; provided that such indemnity shall not, as to the DIP Lender-indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of the DIP Lender-indemnitee. (DIP Agreement, pp. 40-41).

## III.  RELIEF REQUESTED

18. By this Motion, pursuant to Bankruptcy Code §§ 105, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Bankruptcy Rules 2002, 4001, and 9014, the Debtors request:

(a) authorization for the Debtors to borrow up to $2.5 million in principal amount of post-petition financing (the "DIP Financing"), which amount shall include interim financing that is sufficient to pay for bankruptcy related costs and expenses from the Petition Date to the date on which the final hearing on the Motion is held (such interim amount is estimated not to exceed $540,000.00), on the terms and conditions set forth in the DIP Order and DIP Agreement as attached hereto and as summarized in this Motion;

(b) authorization for the Debtors to execute and deliver any necessary DIP Documents, to perform such other and further acts as may be necessary or appropriate in connection therewith, and to grant the liens and security interests to the DIP Lender as provided for in the DIP Order and DIP Agreement;

(c) authorization pursuant to Bankruptcy Code §§ 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) to grant certain liens and superpriority claims to the DIP Lender to secure the Debtors' obligations under the DIP Documents;

    (d) authorization for the DIP Lender to accelerate the maturity of the DIP Loan and terminate the commitments under and in accordance with the DIP Agreement, DIP Order and DIP Documents upon the occurrence and continuance of an event of default, subject to the provisions of this Motion and any order granting this Motion; and

    (e) the Court to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "<u>Final Hearing</u>") for this Court to consider entry of a final order (the "<u>Final Order</u>") authorizing and approving the relief requested in this Motion to become effective pursuant to the Final Order.

**IV.  BASIS FOR RELIEF**

**Request for Approval of the DIP Facility and Related Actions**

  19. As described above, it is essential to the success of the Debtors' chapter 11 cases that the Debtors immediately obtain access to sufficient post-petition financing.  The preservation of estate assets, the Debtors' continuing viability, and their ability to timely reorganize successfully under a plan of reorganization (or maximize values under a liquidating plan of reorganization), all depend heavily upon the approval of the DIP Facility and the related actions requested herein.

  20. Bankruptcy Code § 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Bankruptcy Code § 364(c), a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or a combination of the foregoing.

  21. Because the Debtors propose to obtain financing under the DIP Documents primes any liens that may exist on the Property, the approval of the DIP Facility is governed by Bankruptcy Code § 364(c) and 364(d).

**Financing Under Bankruptcy Code § 364(c)**

22. Pursuant to Bankruptcy Code § 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *see also* 3 Collier on Bankruptcy ¶ 364.03, at 364-7-18 (15th ed. rev.).

23. The statutory requirement for obtaining post-petition credit under Bankruptcy Code § 364(c) is a finding, made after notice and hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37-39 (a debtor must show that it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove that it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)).

24. Courts have articulated a three-part test to determine whether a debtor may obtain financing under Bankruptcy Code § 364(c):

- the debtor is unable to obtain unsecured credit solely under Bankruptcy Code § 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37-39.

25. To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code § 364(c). *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088. Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

26. The Debtors had initial communications with several potential post-petition lenders, none of which were willing to extend credit on an unsecured basis. Based on their discussions with such potential lenders, as well as the poor state of the credit markets, and the general state of the real estate market, the Debtors strongly believe that they are unable to obtain unsecured financing from any capital source.

27. The Debtors and the DIP Lender have engaged in arm's-length negotiations prior to the Petition Date, resulting in the financing proposal discussed in this Motion and proposed for

approval by the Court. Accordingly, the Debtors believe that the terms and conditions outlined in the DIP Agreement are reasonable and justified under the circumstances, in that this facility will enable the Debtors to have sufficient liquidity to continue with their operations and the plan process in a manner that will best serve all parties-in-interest herein.

**Financing and Adequate Protection Under Bankruptcy Code § 364(d)(l)**

28. The Debtors seek approval of the DIP Facility under Bankruptcy Code § 364(d)(l). Specifically, pursuant to the DIP Agreement, the DIP Lender would receive a perfected first priority, senior priming lien upon the Property, even to the extent that the Property was subject to any preexisting liens. The only alleged liens upon the Property that the Debtors are aware of are those claimed by Compass and taxing authorities, and certain liens in favor of Textron Financial Corporation on Harborwalk Operating's golf carts and utility vehicles.

29. The statutory requirement for obtaining post-petition credit under Bankruptcy Code § 364(d)(l) is a finding, made after notice and hearing, that the debtors in possession are "unable to obtain such credit otherwise." In connection with its efforts to obtain adequate post-petition financing, the Debtors and their advisors do not believe that it would have been possible for the Debtors to obtain post-petition financing absent the granting of a first priority priming lien.

**Requirement under Bankruptcy Code § 364(d) of Providing Adequate Protection**

30. Any pre-petition secured creditors whose liens are being "primed" post-petition by the DIP Loan under Bankruptcy Code § 364(d) must be provided with adequate protection of their interests in collateral. *See In re Swedeland Dev. Group., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (*en banc*) (noting that adequate protection is required under Bankruptcy Code

§ 364(d)(l)(B) to ensure that the creditor receives the value for which it bargained pre-bankruptcy).

31. "A sufficient equity cushion is itself a recognized form of adequate protection." *Baybank-Middlesex v. Ralar Distributors, Inc.*, 69 F.3d 1200, 1203 (1st Cir. 1995). Further, "[a] classic method for finding adequate protection is the existence of an equity cushion. In fact, it has been found that an equity cushion standing alone can provide evidence of adequate protection for a secured claim." *In re Patrician St. Joseph Partners Ltd.*, 169 B.R. 669, 677 (D. Ariz. 1994) (citing *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984)); *see also*, *Mendoza v. Temple Inland Mortgage Corp. (In re Mendoza)*, 111 F. 3d 1264, 1272 (5th Cir. 1997) (stating that case law is nearly uniform in holding that an equity cushion of 20% or more constitutes adequate protection); *In re Las Torres Dev., L.L.C.*, 413 B.R. 687, 697 (Bankr. S.D. Tex. 2009) ("It is clear that an equity cushion of 20% or more constitutes adequate protection"); *WMC Mortgage Corp. v. Cartwright (In re Cartwright)*, 2003 Bankr. LEXIS 2296 (Bankr. N.D. Tex. 2003) (finding that creditor was adequately protected by equity cushion); *In re Brokmeyer*, 51 B.R. 704, 706 (Bankr. S.D. Tex. 1985) (finding that equity cushion constitutes adequate protection).

32. The Debtors currently believe that the value of the Property far exceeds the amount of the DIP Loan and the liens alleged by Compass. A September 2009 appraisal of the Harborwalk Property opined that the value of the remaining parcels of the Harborwalk Property owned by Harborwalk, LP was $25.2 million. The appraisal expressly excluded more than a face value amount of $26.7 million in receivables due and owing from TIRZ and MUD. Thus, the value of the Harborwalk Property and the receivables likely exceeds $50 million. Accordingly,

Compass and any other secured party (including taxing authorities) are adequately protected by an equity cushion.

**Protections Under Bankruptcy Code § 364(e)**

33.     The Debtors believe that the terms and conditions of the DIP Facility are the best possible under the circumstances of these cases, and were negotiated in good faith, at arm's length, and with the assistance of counsel on all sides. Accordingly, the DIP Lender should be provided with the benefit and protection of Bankruptcy Code § 364(e), such that if any of the provisions of any order granting this motion are later modified, vacated, stayed, or terminated by subsequent order of this or any other court, the DIP Lender would be fully protected with respect to any amounts disbursed before such modification, vacation, stay, or termination.

**The DIP Facility is Necessary to Preserve the Assets of the Estates**

34.     It is essential that the Debtors obtain financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and these cases, and to otherwise satisfy their working capital requirements. The DIP Loan also is essential to provide the Debtors' customers, members, employees, vendors and other key constituencies, with confidence in the Debtors' ability to administer these cases and conclude their reorganization in a timely manner.

35.     Without immediate access to new borrowing relief, the Debtors' business operations and these cases in general could grind to a halt, which would seriously jeopardize the going-concern value of the Debtors' assets. The new liquidity offered by the proposed DIP Loan would ensure that the Debtors can maintain their assets and administer these cases through the next several months as the plan process ensues. Thus, approval of borrowing under the DIP

Agreement and eventual DIP Documents is crucial to maximizing the value of the Debtors' estates.

**The Terms of the DIP Agreement Are Fair, Reasonable, and Appropriate**

36.     The proposed DIP Agreement provides generally that the security interests and superpriority administrative expense claims granted to the DIP Lenders are subject to the Carve-Out described above.  In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that debtors' estates are adequately assisted by counsel and other professionals.  *Ames*, 115 B.R. at 40.

37.     Likewise, the Debtors believe that the fees and other charges required by the DIP Lender under the DIP Agreement are reasonable and appropriate under the circumstances.  The proposed fees under the DIP Agreement are within the parameters of market fee structures for similar post-petition financing.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Bankruptcy Code § 364.  *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving a debtor-in-possession financing facility that included a lender "enhancement fee").

**Application of the Business Judgment Standard**

38.     As described above, after appropriate investigation and analysis, the Debtors' management and advisors have concluded that the DIP Loan provides the best alternative available under the circumstances of these chapter 11 cases.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business

judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

39. The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under the DIP Agreement and DIP Documents. Accordingly, the Court should grant the Debtors the authority to enter into any necessary DIP Documents and obtain funds from the DIP Lender on the secured and administrative superpriority basis described above, pursuant to Bankruptcy Code § 364(c) and (d).

**Request for Modification of the Automatic Stay**

40. Bankruptcy Code § 362 provides for an automatic stay upon the filing of a bankruptcy case. As summarized above, the proposed DIP Agreement contemplates a modification of the automatic stay to permit (a) the Debtors to grant certain liens under the DIP Documents and to perform the Debtors' liabilities and obligations to the DIP Lender, and (b) the exercise of remedies by the DIP Lender following an event of default. Upon the occurrence of an event of default and during the continuance thereof, the DIP Lender is entitled to exercise its rights and remedies as set forth in the DIP Agreement.

41. The Debtors submit that, in the Debtors' business judgment, such provisions are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the DIP Agreement.

## V.  INTERIM RELIEF

42. Pending final approval of the DIP Loan, the Debtors request that this Court authorize the Debtors to borrow under the DIP Documents on an interim basis, pursuant to Bankruptcy Rule 4001(c)(2), to the extent necessary to avoid immediate and irreparable harm to their business and to these chapter 11 cases prior to any final approval thereof.  It is essential to the continued maintenance of the Debtors' assets and these cases that the Court immediately authorize them to borrow an amount sufficient to pay bankruptcy related costs and expenses for the period pending a final hearing on the Motion, and such amount is estimated not to exceed $540,000.00.  The Debtors urgently need funds to allow them to meet payroll and other current operating expenses, including, without limitation maintenance, utilities, employee, and tax obligations as well as to pay their and others' professionals, and to otherwise continue their ongoing operations and generate necessary funds while they undertake the reorganization process.  Thus, the interim relief requested in this Motion, pending a final hearing, is necessary, appropriate, fully warranted, and essential to the Debtors' efforts to maximize the value of their estates in these chapter 11 cases for the benefit of all of their creditors and parties-in-interest.

43. Accordingly, pending a final hearing on the Motion, the Debtors respectfully request that the Court approve the terms of the DIP Agreement on an interim basis pursuant to the terms of the proposed Interim Order.

WHEREFORE, premises considered, the Debtors request that this Court enter an Interim Order authorizing the Debtors to obtain the post-petition financing described herein on an interim basis, setting the Motion for a final hearing, and granting such other and further relief as the Court may deem just and proper.

Dated: January 25, 2010

        Respectfully submitted,

        **BRACEWELL & GIULIANI LLP**

        By: */s/ Marcy E. Kurtz*
            Marcy E. Kurtz
            Texas Bar No. 11768600
            Marcy.Kurtz@bgllp.com
            William A. (Trey) Wood III
            Texas Bar No. 21916050
            Trey.Wood@bgllp.com
            Chris S. Tillmanns
            Texas Bar No. 24060730
            Chris.Tillmanns@bgllp.com
            Bracewell & Giuliani LLP
            711 Louisiana, Suite 2300
            Houston, Texas 77002
            Telephone:   (713) 223-2300
            Facsimile:   (713) 221-1212

        **PROPOSED ATTORNEYS FOR THE DEBTORS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served on the parties listed in the attached Service List via electronic means as listed on the court's ECF noticing system or by regular U. S. First Class Mail, and by electronic mail or facsimile as indicated, on this 25th day of January, 2010.

        By: /s/ Marcy E. Kurtz
            Marcy E. Kurtz