# EXHIBIT A

1805427

**SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT**

Among

**HARBORWALK, L.P.,**

**HARBORWALK SALES CORPORATION**

and

**HARBORWALK MARINA OPERATING COMPANY, LTD.**

Each as a Debtor and Debtor-in-Possession
as Borrowers,

**KLEIN EQUITIES, LLC**

as DIP Lender

**Table of Contents**

**Page**

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ......................................................... 1
    1.1    Defined Terms ........................................................................................................... 1
    1.2    Other Interpretive Provisions ................................................................................. 13
    1.3    Accounting Terms .................................................................................................. 14
    1.4    Times of Day .......................................................................................................... 14

ARTICLE II THE COMMITMENTS ................................................................................... 14
    2.1    DIP Loans .............................................................................................................. 14
    2.2    Method of Borrowing ............................................................................................. 14
    2.3    Prepayments .......................................................................................................... 15
    2.4    Repayment of Principal.......................................................................................... 16
    2.5    Interest.................................................................................................................... 16
    2.6    Fees ........................................................................................................................ 16
    2.7    Computation of Interest and Fees .......................................................................... 16
    2.8    Evidence of Debt.................................................................................................... 17
    2.9    Payments Generally ............................................................................................... 17
    2.10   Joint and Several Liability of the Borrowers ......................................................... 17
    2.11   Superpriority Claim and Liens ............................................................................... 18
    2.12   Waiver of any Priming Rights ............................................................................... 18

ARTICLE III TAXES AND YIELD PROTECTION .............................................................. 18
    3.1    Taxes...................................................................................................................... 18
    3.2    Increased Costs ...................................................................................................... 19
    3.3    Survival ................................................................................................................. 20

ARTICLE IV CONDITIONS PRECEDENT TO ADVANCES .................................................. 21
    4.1    Initial Conditions Precedent................................................................................... 21
    4.2    Conditions to all DIP Loans .................................................................................. 22

ARTICLE V REPRESENTATIONS AND WARRANTIES ...................................................... 23
    5.1    Existence, Qualification and Power; Compliance with Laws................................... 23
    5.2    Authorization; No Contravention ........................................................................... 23
    5.3    Governmental Authorization; Other Consents........................................................ 23
    5.4    Binding Effect........................................................................................................ 24
    5.5    [Intentionally Omitted] .......................................................................................... 24
    5.6    Ownership of Property; Liens................................................................................. 24
    5.7    Insurance................................................................................................................ 24
    5.8    Taxes...................................................................................................................... 24
    5.9    ERISA Compliance................................................................................................ 24
    5.10   Subsidiaries ........................................................................................................... 25
    5.11   Margin Regulations; Investment Company Act ...................................................... 25
    5.12   Disclosure ............................................................................................................. 25

| 5.13 | Compliance with Laws | 25 |
|------|----------------------|----|
| 5.14 | Intellectual Property; Licenses, Etc | 26 |
| 5.15 | Rights in Collateral; Priority of Liens | 26 |
| 5.16 | System Compliance; Status of Construction | 26 |
| 5.17 | Utility Availability | 26 |

**ARTICLE VI AFFIRMATIVE COVENANTS** ........................................................... 26

| 6.1 | Financial Reporting | 26 |
|------|---------------------|----|
| 6.2 | Certificates; Other Information | 27 |
| 6.3 | Notices | 27 |
| 6.4 | Payment of Obligations | 28 |
| 6.5 | Preservation of Existence, etc. | 28 |
| 6.6 | Maintenance of Properties | 28 |
| 6.7 | Maintenance of Insurance | 29 |
| 6.8 | Compliance with Laws | 29 |
| 6.9 | Books and Records | 29 |
| 6.10 | Inspection Rights and Field Audit | 29 |
| 6.11 | Use of Proceeds | 29 |
| 6.12 | Collateral Records | 29 |
| 6.13 | Security Interests and Collateral Assignments | 30 |
| 6.14 | Cash Management | 30 |
| 6.15 | Further Assurances | 30 |
| 6.16 | Appointment Rights | 30 |
| 6.17 | Bankruptcy Related Affirmative Covenants | 31 |

**ARTICLE VII NEGATIVE COVENANTS** ................................................................ 31

| 7.1 | Liens | 31 |
|------|-------|----|
| 7.2 | Investments | 32 |
| 7.3 | Debt | 32 |
| 7.4 | Fundamental Changes | 32 |
| 7.5 | Dispositions | 32 |
| 7.6 | Distributions | 32 |
| 7.7 | Change in Nature of Business | 32 |
| 7.8 | Transactions with Affiliates | 32 |
| 7.9 | [Intentionally Omitted] | 32 |
| 7.10 | Use of Proceeds | 32 |
| 7.11 | Prepayment of Debt | 33 |
| 7.12 | Bankruptcy Related Negative Covenants | 33 |

**ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES** ..................................... 34

| 8.1 | Events of Default | 34 |
|------|-------------------|----|
| 8.2 | Remedies Upon Event of Default | 37 |
| 8.3 | Application of Funds | 37 |

**ARTICLE IX MISCELLANEOUS** ........................................................................... 38

| 9.1 | Amendments, Etc. | 38 |
|------|------------------|----|
| 9.2 | Notices; Effectiveness; Electronic Communications | 38 |

9.3     No Waiver; Cumulative Remedies ................................................................................ 39
9.4     Expenses; Indemnity; Damage Waiver.......................................................................... 39
9.5     Payments Set Aside........................................................................................................ 40
9.6     Successors and Assigns.................................................................................................. 41
9.7     Right of Setoff................................................................................................................ 42
9.8     Interest Rate Limitation ................................................................................................. 42
9.9     Counterparts; Integration; Effectiveness....................................................................... 42
9.10    Survival of Representations and Warranties.................................................................. 42
9.11    Severability .................................................................................................................... 43
9.12    Governing Law; Jurisdiction; Etc. ................................................................................ 43
9.13    USA PATRIOT Act Notice ........................................................................................... 43
9.14    Representative Borrower ................................................................................................ 43
9.15    Time of the Essence ....................................................................................................... 43
9.16    No Oral Agreements ....................................................................................................... 43
9.17    Relationship with DIP Orders........................................................................................ 44
9.18    Tax Matters .................................................................................................................... 44

**SCHEDULES**

5.8     Taxes
5.10    Subsidiaries
5.16    Unpaid amounts owed to contractors and other mechanics and materialmen
7.1     Liens
9.2     Addresses for Notices

**EXHIBITS – Form of**

A       Notice of Borrowing
B       Term Note
C       Approved Budget
D       Property Description
E       Project Description

**SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT**

This SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "***Agreement***") is dated as of _____, 2010, among HARBORWALK, L.P., a Texas limited partnership ("***Harborwalk***"), HARBORWALK SALES CORPORATION, a Texas corporation ("***HSC***"), HARBORWALK MARINA OPERATING COMPANY, LTD., a Texas limited partnership ("***HMOC, Ltd.***") and, collectively with Harborwalk and HSC, the "***Borrowers***" and each individually a "***Borrower***"), and KLEIN EQUITIES, LLC, a Texas limited liability company (the "***DIP Lender***").

## RECITALS

A.      On January [__], 2010 (the "***Petition Date***"), each of the Borrowers filed a voluntary petition for relief (collectively, the "***Chapter 11 Cases***") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "***Bankruptcy Court***").

B.      The Borrowers are continuing to operate their respective businesses and manage their respective properties as debtors in possession under Sections 1107 and 1108 of the Bankruptcy Code.

C.      The Borrowers have requested that the DIP Lender provide a secured super-priority loan facility of up to $2,500,000 to the Borrowers on the terms and conditions set forth herein, and the DIP Lender are willing to make available to the Borrowers such post-petition loans upon the terms and subject to the conditions set forth herein.

D.      Such loans will be used to pay related fees and expenses incurred in connection with negotiation, execution and delivery of this Agreement and to pay operating and development expenses, capital expenditures, current interest and fees on the loan made pursuant hereto and other expenses of administration of the cases in accordance with the Approved Budget (defined below) to the extent permitted hereby.

E.      Each of the Borrowers has agreed to secure (or to cause to be secured) its obligations to the DIP Lender hereunder with, *inter alia*, priming, first priority security interests in, and liens on, all of its property and assets of every type and description whatsoever, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, including but not limited to any and all Bankruptcy Recoveries and all commercial tort claims, other claims and causes of action, the rights of the Borrowers to receive reimbursements from municipal utility districts or tax increment reinvestment zones or other Persons all as more fully provided herein.

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**1.1      Defined Terms.** As used in this Agreement, the following terms shall have the meanings set out below:

***Affiliate*** has the meaning specified in Section 101 of the Bankruptcy Code.

**Agreement** means this Agreement, as it may be amended, restated, or supplemented from time to time.

**Approved Budget** means the Borrowers' rolling thirteen (13) week cash flow projection reflecting on a line-item basis anticipated sales, cash receipts, inventory levels, and expenditures for the subject period and annexed hereto as **Exhibit C**, as same shall be modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) including in each of the initial budget or subsequent modifications or supplements changes of which the DIP Lender approves in writing in its sole discretion, together with such supporting documentation as reasonably requested by the DIP Lender.

**Attributable Debt** means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, and (b) in respect of any Synthetic Lease Obligations, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a capital lease.

**Availability Period** means the period from the Closing Date to the earliest of (i) _____ ___, 2010 **[the day before six months after the date hereof]**, (ii) the date of termination of the commitment of the DIP Lender to make DIP Loans pursuant to **Section 8.2**, (iii) the date on which any of the cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (iv) the effective date of a plan of reorganization with respect to any of the Borrowers, or (v) the initial funding of any loan or advance pursuant to any other debtor-in-possession financing facility.

**Bankruptcy Code** means title 11 of the United States Code, as in effect from time to time, or any successor thereto.

**Bankruptcy Court** has the meaning specified in Recital A to this Agreement.

**Bankruptcy Recoveries** means any and all claims and causes of action which a Borrower may be entitled to assert by reason of any avoidance or other power vested in or on behalf of a Borrower or the estate of a Borrower under Chapter 5 of the Bankruptcy Code (other than those arising under Section 549 of the Bankruptcy Code) and any and all recoveries or proceeds of any such claims or causes of action.

**Borrowers** and **Borrower** have the respective meanings given them in the introductory paragraph to this Agreement.

**Borrowing Date** means the date on which any DIP Loan is to be made available to Borrowers.

**Business Day** means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the State of Texas.

*Capital Expenditures* means for any period, and without duplication, the aggregate of all expenditures for fixed or capital assets determined in accordance with GAAP (excluding any such assets acquired in connection with normal replacement and maintenance programs properly expensed in accordance with GAAP).

*Capital Lease* of a Person means any lease of any asset by such Person as lessee that would, in accordance with GAAP, be required to be classified and accounted for as a capital lease on the balance sheet of such Person.

*Cash Management Account* means, as applicable, Harborwalk's Account No. 41305379, maintained at Texas First Bank, HMCO Ltd's Account No. 31122341, maintained at Texas First Bank, and HSC's Account No. 3382761, maintained at Amegy Bank.

*Casualty Event* means, with respect to any asset owned by any Person, (a) any loss or damage to, or any condemnation or taking of, such asset for which such Person receives, anticipates recovering or has filed a claim for Casualty Proceeds or (b) any Lien imposed by any Governmental Authority pursuant to Environmental Law and that has not been released or bonded within ten Business Days following the applicable Borrower's receipt of notice of such imposition unless such Lien is being contested in good faith and by appropriate proceedings.

*Casualty Proceeds* means the proceeds of any insurance, condemnation award or other compensation paid or payable to any Borrower or the DIP Lender in respect of any Casualty Event, less the reasonable fees, taxes and expenses paid to collect such proceeds.

*Change in Law* means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

*Change of Control* means the occurrence of any of the following:

(a)    the failure of Harborwalk Investments, LLP and Harborwalk GP, LLC at any time to directly or indirectly own beneficially and of record on a fully diluted basis 100% of the outstanding Equity Interests of Harborwalk, free and clear of all Liens;

(b)    the failure of Harborwalk at any time to directly or indirectly own beneficially and of record on a fully diluted basis 100% of the outstanding Equity Interests of HSC, free and clear of all Liens (other than Liens granted in favor of the DIP Lender);

(c)    the failure of Harborwalk and Harborwalk Marina GP, LLC at any time to directly or indirectly own beneficially and of record on a fully diluted basis 100% of the outstanding Equity Interests of HMOC, Ltd., free and clear of all Liens (other than Liens granted in favor of the DIP Lender); or

(d)    the failure of the Persons who directly or indirectly (whether through one or more other Persons) own Equity Interests on the date hereof in Harborwalk Investments, LLP,

Harborwalk GP, LLC or Harborwalk Marina GP, LLC to own beneficially and of record 100% of such outstanding Equity Interests of each such entity or to fail to Control each such entity.

*Chapter 11 Cases* has the meaning specified in Recital A to this Agreement.

*Closing Date* means the first date all the conditions precedent in *Section 4.1* are satisfied or waived in accordance with *Section 10.1*.

*Code* means the Internal Revenue Code of 1986.

*Collateral* shall mean any and all assets and rights and interests in or to property of each Borrower of every type and description whatsoever, whether real or personal, tangible or intangible, in which a Lien is granted or purported to be granted pursuant to the Collateral Documents.  Without limiting the foregoing, the Collateral shall include a priming, first priority security interest in, and liens on, all the Borrowers' property and assets of every type and description whatsoever, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, including but not limited to any and all Bankruptcy Recoveries and all commercial tort claims, other claims and causes of action, the rights of the Borrowers to receive reimbursement from municipal utility districts or tax incentive reinvestment zones or other Persons.

*Collateral Documents* means all security agreements, pledge agreements, stock and unit transfer powers, collateral assignments of contracts, licenses, permits, deeds of trust, leasehold deeds of trust, agreements, instruments, assignments, and documents now or hereafter executed and delivered in connection with this Agreement pursuant to which Liens are granted or purported to be granted, or rights assigned or purported to be assigned, to the DIP Lender in Collateral securing all or part of the Obligations each in form and substance satisfactory to the DIP Lender.

*Commitment* means the obligation of the DIP Lender to make DIP Loans to Borrowers pursuant to *Section 2.1*, in an aggregate principal amount at any one time outstanding not to exceed $2,500,000, as such amount may be adjusted from time to time in accordance with this Agreement.

*Contractual Obligations* means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

*Control* means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "*Controlling*" and "*Controlled*" have meanings correlative thereto.

*Creditors' Committee* means any official committee of creditors formed, appointed or approved in any of the Chapter 11 Cases pursuant to the Bankruptcy Code.

*Debt* means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(e)      all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(f)      all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(g)      net obligations of such Person under any Swap Contract;

(h)      all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business);

(i)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(j)      Capital Leases and Synthetic Lease Obligations;

(k)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends; and

(l)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Debt of any Person shall include the Debt of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Debt is expressly made non-recourse to such Person.  The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of any Capital Lease or Synthetic Lease Obligations as of any date shall be deemed to be the amount of Attributable Debt in respect thereof as of such date.

***Debtor Relief Laws*** means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

***Default*** means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

***Default Rate*** means a rate of interest equal to the lesser of 17.5% per annum or the Maximum Rate.

***DIP Lender*** has the meaning specified in the preamble to this Agreement.

**DIP Loan** or **DIP Loans** has the meaning specified in **Section 2.1**.

**DIP Orders** means the Interim Borrowing Order and the Final Borrowing Order.

**Disposition** or **Dispose** means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

**Distribution** means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Borrower, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such capital stock or other Equity Interest or on account of any return of capital to such Borrower's members, partners, or shareholders (or the equivalent thereof).

**Dollar** and **$** mean lawful money of the United States.

**Effect of Bankruptcy** means, with respect to any contractual obligation, contract or agreement to which a Borrower is a party, any default, unenforceability or other legal consequences arising solely on account of the commencement of the Chapter 11 Cases (including by the implementation of the automatic stay) or, as a result of any order of the Bankruptcy Court, the rejection of any such contractual obligation, contract or agreement.

**Environmental Laws** means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

**Environmental Liability** means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of Borrowers, directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

**Equity Interests** means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member

or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

*ERISA* means the Employee Retirement Income Security Act of 1974.

*ERISA Affiliate* means any trade or business (whether or not incorporated) under common control with Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

*ERISA Event* means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 400 1(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon Borrower or any ERISA Affiliate.

*Event of Default* has the meaning specified in *Section 8.1*.

*Excluded Taxes* means, with respect to the DIP Lender, or any other recipient of any payment to be made by or on account of any obligation of Borrowers hereunder, taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located.

*Existing Credit Agreement* means the Development Loan Agreement, dated December 20, 2002, between Texas State Bank and Harborwalk.

*Final Borrowing Order* means a Final Order of the Bankruptcy Court in form, scope and substance acceptable to the DIP Lender, which, among other matters but not by way of limitation, authorizes the Borrowers to obtain credit, incur Obligations and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the DIP Lender's claims.

*Final Order* means an order or judgment of the Bankruptcy Court as entered on the docket of the Clerk of the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, petition for certiorari, reargue or seek rehearing has expired and no proceeding for certiorari, reargument or rehearing is pending or if an appeal, petition for certiorari, reargument, or rehearing has been sought, the order or judgment of the Bankruptcy Court has been affirmed by the highest court to which the order or judgment was appealed, from which the reargument or rehearing was sought, or certiorari has been denied and

the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

**FRB** means the Board of Governors of the Federal Reserve System of the United States.

**GAAP** means generally accepted accounting principles in the United States set out in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

**General Partner** means each of, and **General Partners** means both of the Harborwalk General Partners and the HMOC, Ltd. General Partners.

**Governmental Authority** means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

**Guarantee** means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Debt or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Debt or other obligation of the payment or performance of such Debt or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Debt or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Debt or other obligation of any other Person, whether or not such Debt or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

**Harborwalk** has the meaning specified in the preamble to this Agreement.

**Harborwalk General Partner** means Harborwalk GP, LLC, a Texas limited liability company.

*Hazardous Materials* means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

*HMOC, Ltd.* has the meaning specified in the preamble to this Agreement.

*HMOC, Ltd. General Partner* means Harborwalk Marina GP, LLC, a Texas limited liability company.

*HSC* has the meaning specified in the preamble to this Agreement.

*Indemnified Taxes* means Taxes other than Excluded Taxes.

*Indemnitees* has the meaning specified in *Section 10.4(b)*.

*Initial Approved Budget* means the Approved Budget for the 13-week period commencing with the week ended _____, 2010, a copy of which is attached hereto as *Exhibit D*.

*Interim Borrowing Order* means an order of the Bankruptcy Court which order shall be in form, scope and substance acceptable to the DIP Lender, approving, on an interim basis, the Borrowers' entering into and performing their obligations under this Agreement and the other Loan Documents.

*Investment* means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Debt of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

*IRS* means the United States Internal Revenue Service.

*Laws* means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

*Lien* means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

*Loan Documents* means this Agreement, each Note, each Collateral Document, and each other agreement or instrument executed at any time in connection with this Agreement.

*Material Adverse Effect* means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Borrowers taken as a whole; (b) a material impairment of the ability of any Borrower to perform its obligations under any Loan Document to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Borrower of any Loan Document to which it is a party.  The filing of the Chapter 11 Cases or any Effect of Bankruptcy as a result thereof or the effect of any action required to be taken hereunder or under the DIP Orders shall not constitute a Material Adverse Event.

*Maturity Date* means the earlier of (i) _____, 2010 **[six months after the date hereof]**, (ii) the date of the termination of the commitment of the DIP Lender to make DIP Loans in accordance with *Section 8* of this Agreement or otherwise, (iii) the date on which any of the cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, (iv) the effective date of a plan of reorganization with respect to any of the Borrowers, or (v) the initial funding of any loan or advance pursuant to any other debtor-in-possession financing facility.

*Maximum Rate* means the maximum nonusurious interest rate under applicable law (determined under such laws after giving effect to any items which are required by such laws to be construed as interest in making such determination, including without limitation, if required by such laws, certain fees and other costs).

*Multiemployer Plan* means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

*Note* means the promissory note or notes substantially in the form of *Exhibit B* executed by Borrowers and made payable to the DIP Lender in the aggregate original principal amount of the Commitment.

*Notice of Borrowing* means a notice of borrowing in the form of the attached *Exhibit A* signed by a Responsible Officer of the Representative Borrower.

*Obligations* means all advances to, and debts, liabilities, obligations, covenants and duties of, any Borrower arising under any Loan Document or otherwise, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the

commencement by or against any Borrower or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

*Organization Documents* means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

*Other Taxes* means all present or future stamp, intangible or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

*Participant* has the meaning specified in *Section 9.6(c)*.

*PBGC* means the Pension Benefit Guaranty Corporation.

*Pension Plan* means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Borrower or any ERISA Affiliate or to which any Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

*Permitted Debt* means Debt permitted under *Section 7.3*.

*Permitted Liens* means Liens permitted under *Section 7.1*.

*Person* means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

*Petition Date* has the meaning specified in Recital A to this Agreement.

*Plan* means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

**Post-Petition** means the time period commencing immediately upon the filing of the Chapter 11 Cases.

**Pre-Petition** means the time period ending immediately prior to the filing of the Chapter 11 Cases.

**Pre-Petition Indebtedness** means any or all Debt incurred prior to the filing of the Chapter 11 Cases.

**Project** means the land and improvements more fully described in **Exhibit E** attached hereto and incorporated herein by reference.

**Property** means the real property described in **Exhibit D** attached hereto and incorporated herein by reference, together with the improvements thereon and all other property constituting the "Mortgaged Property," as described in the Mortgage, and the collateral described in the Security Agreement.

**Related Parties** means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

**Reportable Event** means any of the events set out in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

**Representative Borrower** means Harborwalk.

**Responsible Officer** means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of a Borrower.  Any document delivered hereunder that is signed by a Responsible Officer of a Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Borrower.

**Subsidiary** of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Harborwalk.

**Swap Contract** means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any

combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "*Master Agreement*"), including any such obligations or liabilities under any Master Agreement.

*Swap Termination Value* means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in *clause (a)*, the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include the DIP Lender or any Affiliate of the DIP Lender).

*Synthetic Lease Obligations* means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

*Taxes* means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

*Term Principal Amount* means, when determined, the outstanding principal amount of all Notes.

*Unfunded Pension Liability* means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

*United States* and *U.S.* mean the United States of America.

**1.2     Other Interpretive Provisions.**  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall" Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such

agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set out herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     In the computation of periods of time from a specified date to a later specified date, the word *from* means *from and including*; the words *to* and *until* each mean *to but excluding*; and the word *through* means *to and including*.

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**1.3     Accounting Terms.**  All accounting terms not specifically or completely defined herein shall be construed in conformity with GAAP.

**1.4     Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to Central time (daylight or standard, as applicable).

**ARTICLE II**
**THE COMMITMENTS**

**2.1     DIP Loans.**  The DIP Lender agrees, on the terms and conditions set out in this Agreement, to make loans (collectively, the "***DIP Loans***" and individually, a "***DIP Loan***") to Borrowers during the Availability Period in an aggregate amount up to but not to exceed the amount of the Commitment.  The DIP Loans are term loans and are not revolving loans, and principal payments or prepayments made in respect of the Term Principal Amount may not be reborrowed.

**2.2     Method of Borrowing.**

(a)     <u>Notice</u>.  Each DIP Loan shall be made pursuant to a Notice of Borrowing. Once all applicable conditions under ***Article IV*** have been satisfied, such Notice of Borrowing shall be given to the DIP Lender not later than 10:00 a.m. on the third Business Day preceding the requested Borrowing Date; provided that only the prior day's notice shall be provided in the case of the initial DIP Loan.  The initial DIP Loan shall be made on the day after the Initial Borrowing Order is entered, and subsequent DIP Loans shall be made monthly (or more often

with consent of the DIP Lender) during the Availability Period on the same day of each month thereafter so long as all conditions under Article IV have been satisfied and the Borrower shall have given an appropriate Notice of Borrowing at least three Business Days prior to such Borrowing Date.  The Notice of Borrowing shall be signed by each Borrower and shall be in writing in the form attached as ***Exhibit A*** specifying (i) the Borrowing Date (which shall be a Business Day) and (ii) the aggregate amount of such DIP Loan.  After the fulfillment of the applicable conditions set forth in ***Article IV***, the DIP Lender will promptly make such funds available to the Borrowers not later than 2:00 p.m. on the Borrowing Date by deposit into the Representative Borrower's Cash Management Account.

(b)    Certain Limitations. Notwithstanding anything in *clause (a)* above, the DIP Lender shall not be required to make a DIP Loan in an amount less than $100,000.

(c)    Notices Irrevocable. Each Notice of Borrowing delivered by a Borrower shall be irrevocable and binding on the Borrowers.

### 2.3    Prepayments.

(a)    Optional Prepayment. Borrower may, upon notice to the DIP Lender, at any time or from time to time voluntarily prepay the Term Principal Amount in whole or in part; *provided that* (i) such notice must be received by the DIP Lender not later than 11:00 a.m. on the date of prepayment and (ii) any prepayment shall be in a principal amount of $100,000 or a whole multiple of $10,000 in excess thereof or, in each case and as applicable, if less, the entire Term Principal Amount then outstanding.  Each such notice shall specify the date and amount of such prepayment.  If such notice is given by a Borrower, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any amount so prepaid may not be reborrowed.

(b)    Collateral Disposition. Immediately upon receipt of the net proceeds (after deducting the customary and reasonable fees and expenses of such Disposition) from any Disposition of Collateral (other than Dispositions of inventories of goods (but not inventories of real property) in the ordinary course of business for fair market value), the Borrowers shall prepay the Term Principal Amount in an amount equal to 100% of such net proceeds.  All such prepayments shall be applied (i) first, to due and unpaid fees and expenses; (ii) second, to accrued and unpaid interest; (iii) third, to the outstanding principal amount of DIP Loans; and (iv) fourth, to any remaining amounts due to the DIP Lender under this Agreement and the other Loan Documents.  Nothing in this ***Section 2.3(b)*** may be construed to be a consent by the DIP Lender to any Disposition.

(c)    Casualty Event. Following any Casualty Event, all Casualty Proceeds in respect of such Casualty Event shall be applied on the date of receipt to prepay the Term Principal Amount until it is paid in full.  All such prepayments shall be applied (i) first, to due and unpaid fees and expenses; (ii) second, to accrued and unpaid interest; (iii) third, to the outstanding principal amount of the DIP Loans; and (iv) fourth, to any remaining amounts due to the DIP Lender under this Agreement and the other Loan Documents.

**2.4**    **Repayment of Principal.** The Term Principal Amount and any accrued and unpaid interest thereon shall be payable by Borrowers on the Maturity Date.

**2.5**    **Interest.** Borrowers shall pay interest on the unpaid principal amount of each DIP Loan made from the date of such DIP Loan until such principal amount shall be paid in full, at the following rates per annum:

(a)    Prior to Default. At a rate per annum equal to 12.5 percent per annum; payable monthly on the first day of each month, commencing with the first such date after such DIP Loan is made and as otherwise herein provided.

(b)    Default Rate and Past Due Amounts. Upon the occurrence and during the continuance of an Event of Default, each Borrower shall from time to time on demand pay interest, to the extent permitted by law, on the outstanding Term Principal Amount up to but excluding the date of actual payment (after as well as before judgment) at the Default Rate. Unpaid interest will compound annually.

**2.6**    **Fees**.

(a)    Facility Fee. Borrowers shall pay to the DIP Lender, a facility fee equal to one and one-half percent of the Commitment. Such fee will be payable on the date of the initial DIP Loan advance, will be fully earned when paid and shall be nonrefundable for any reason whatsoever.

(b)    Unused Commitment Fee. For the period commencing on the date of this Agreement and ending on the last day of the Availability Period, the Borrowers shall pay to the DIP Lender an unused commitment fee equal to four-tenths of one percent per month of the amount by which the average daily Commitment during the period for which payment is made exceeds the average daily aggregate outstanding principal amount of the DIP Loans during such period.   Such fee will be payable in arrears on the first day of each month hereafter for the period (i) in the case of the initial payment of such fee, commencing on the date hereof and ending on the last day of the month during which this Agreement was executed and (ii) in the case of any other payment of such fee, commencing on the first day of the month and ending on the last day of such month or the last day of the Availability Period, as the case may be. For each such period other than the initial period and the final period, the amount of the unused commitment fee shall be equal to four-tenths of one percent of the excess amount referred to in the first sentence of this ***Section 2.6(b)*** and for the first and last such periods shall equal four-tenths of one percent of such excess times the number of days during the applicable period divided by 30. The unused commitment fee shall be fully earned when paid and shall be non-refundable for any reason whatsoever.

**2.7**    **Computation of Interest and Fees.** All computations of interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more interest being paid than if computed on the basis of a 365-day year). Interest shall accrue on each DIP Loan for the day on which such DIP Loan is made, and shall not accrue on a DIP Loan, or any portion thereof, for the day on which such DIP Loan, or such portion, is paid, *provided that* any DIP Loan that is repaid on the same day on which it is made shall bear interest for one day. Each

determination by DIP Lender of a fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

**2.8    Evidence of Debt.**  The DIP Loans shall be evidenced by one or more accounts or records maintained by the DIP Lender in the ordinary course of business.  The accounts or records maintained by the DIP Lender shall be conclusive absent manifest error of the amount of the DIP Loans made to Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrowers hereunder to pay any amount owing with respect to the Obligations.  Borrowers shall execute and deliver to the DIP Lender a Note, which shall evidence the DIP Loans in addition to such accounts or records.  The DIP Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its DIP Loans and payments with respect thereto.

**2.9    Payments Generally.**  All payments to be made by Borrowers shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by Borrowers hereunder shall be made to the DIP Lender at the address set forth herein in Dollars and in immediately available funds not later than 12:00 noon on the date specified herein.  All payments received by the DIP Lender after 12:00 noon shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

**2.10    Joint and Several Liability of the Borrowers.**

(a)    Each of the Borrowers is accepting joint and several liability hereunder in consideration of the DIP Loans to be provided by the DIP Lender under this Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of each of the Borrowers to accept joint and several liability for the obligations of each of them with respect to the Obligations.

(b)    Each of the Borrowers jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower, with respect to the payment and performance of all of the obligations arising under this Agreement, it being the intention of the parties hereto that all the obligations with respect to the Obligations shall be the joint and several obligations of all the Borrowers without preferences or distinction among them.

(c)    If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the obligations hereunder as and when due or to perform any of such obligations in accordance with the terms thereof, then in each such event the other Borrower will make such payment with respect to, or perform, such obligation.

(d)    The obligations of each Borrower under the provisions of this ***Section 2.10*** constitute full recourse obligations of such Borrower enforceable against it to the full extent of its properties and assets, irrespective of the validity, regularity, or enforceability of this Agreement or any other circumstance whatsoever.

(e)     The provisions of this **Section 2.10** are made for the benefit of the DIP Lender and its successors and assigns, and may be enforced by them in accordance with the terms of this Agreement from time to time against any of the Borrowers as often as occasion therefor may arise and without requirement on the part of the DIP Lender first to marshal any of their claims or to exercise any of their rights against the other Borrower or to exhaust any remedies available to them against the other Borrower or to resort to any other source or means of obtaining payment of any of the obligations hereunder or to elect any other remedy.  The provisions of this **Section 2.10** shall remain in effect until all the obligations hereunder shall have been paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the obligations, is rescinded or must otherwise be restored or returned by the DIP Lender upon the insolvency, bankruptcy or reorganization of the Borrowers, or otherwise, the provisions of this **Section 2.10** will forthwith be reinstated in effect, as though such payment had not been made.

**2.11     Superpriority Claim and Liens.** Each Borrower hereby covenants, represents and warrants that, upon entry of the Interim Borrowing Order (and the Final Borrowing Order, as applicable) the Borrowers grant the Liens as provided in the DIP Orders.

**2.12     Waiver of any Priming Rights.** Upon the Effective Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, each Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

## ARTICLE III
## TAXES AND YIELD PROTECTION

**3.1     Taxes.**

(a)     <u>Payments Free of Taxes</u>. Any and all payments by Borrowers to or on account of any obligation of Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, *provided that* if Borrowers shall be required by any applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section), the DIP Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrowers shall make such deductions, and (iii) Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     <u>Payment of Other Taxes by Borrower</u>. Subject to the terms of the Bankruptcy Code, without limiting the provisions of *subsection (a)* above, Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     <u>Indemnification by Borrower</u>. Subject to the terms of the Bankruptcy Code, Borrowers shall indemnify the DIP Lender, within 10 days after demand therefor, for the

full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the DIP Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrowers by the DIP Lender shall be conclusive absent manifest error.

(d)      Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by Borrowers to a Governmental Authority, Borrowers shall deliver to the DIP Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the DIP Lender.

(e)      Status of the DIP Lender. The DIP Lender, if requested by Borrowers, shall deliver such documentation prescribed by applicable law or reasonably requested by Borrowers as will enable the Borrower to determine whether the DIP Lender is subject to backup withholding or information reporting requirements.

(f)      Treatment of Certain Refunds. If the DIP Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by Borrowers or with respect to which Borrowers have paid additional amounts pursuant to this Section, it shall pay to Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrowers under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the DIP Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided that* Borrowers, upon the request of the DIP Lender, agree to repay the amount paid over to the Borrowers (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the DIP Lender if the DIP Lender is required to repay such refund to such Governmental Authority.  This subsection shall not be construed to require the DIP Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

**3.2     Increased Costs.**

(a)      Increased Costs Generally.  If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the DIP Lender;

(ii)     subject the DIP Lender to any tax of any kind whatsoever with respect to this Agreement, or change the basis of taxation of payments to the DIP Lender in respect thereof (except for Indemnified Taxes or Other Taxes

covered by **Section 3.1** and the imposition of, or any change in the rate of, any Excluded Tax payable by the DIP Lender); or

(iii)    impose on the DIP Lender any other condition, cost or expense affecting this Agreement or the DIP Loans made by the DIP Lender; and

and the result of any of the foregoing shall be to increase the cost to the DIP Lender of making or maintaining the DIP Loans (or of maintaining its obligation to make any DIP Loans), or to increase the cost to the DIP Lender, or to reduce the amount of any sum received or receivable by the DIP Lender hereunder (whether of principal, interest or any other amount) then, upon written request of the DIP Lender, the Borrowers will pay to the DIP Lender, such additional amount or amounts as will compensate the DIP Lender, for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>. If the DIP Lender determines that any Change in Law affecting the DIP Lender or the DIP Lender's Affiliates, if any, regarding capital requirements has or would have the effect of reducing the rate of return on the DIP Lender's capital or on the capital of the DIP Lender's Affiliates, if any, as a consequence of this Agreement, the Commitments of the DIP Lender of the Affiliates made by, the DIP Lender, to a level below that which the DIP Lender or the DIP Lender's Affiliates could have achieved but for such Change in Law (taking into consideration the DIP Lender's policies and the policies of the DIP Lender's Affiliates with respect to capital adequacy), then from time to time Borrowers will pay to the DIP Lender or such Affiliates, as the case may be, such additional amount or amounts as will compensate the DIP Lender or the DIP Lender's Affiliates for any such reduction suffered.

(c)    <u>Certificates for Reimbursement</u>. A certificate of the DIP Lender setting forth the amount or amounts necessary to compensate the DIP Lender or its Affiliates, as the case may be, as specified in *subsection (a) or (b)* of this Section and delivered to Borrowers shall be conclusive absent manifest error.  Borrowers shall pay the DIP Lender or such Affiliates, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)    <u>Delay in Requests</u>. Failure or delay on the part of the DIP Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of the DIP Lender's right to demand such compensation, *provided that* Borrowers shall not be required to compensate the DIP Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that the DIP Lender, or such Affiliates, as the case may be, notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of the DIP Lender's, or such Affiliates, intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.3    Survival.** All of Borrowers' obligations under this **Article III** shall survive termination of the Commitments and repayment of all Obligations hereunder.

**ARTICLE IV
CONDITIONS PRECEDENT TO ADVANCES**

**4.1    Initial Conditions Precedent.** The obligation of the DIP Lender to make its initial DIP Loan hereunder is subject to satisfaction of the following conditions precedent:

(a)    The DIP Lender's receipt of the following, each of which shall be originals (or telecopies or portable document format (PDF) copies, in each case followed promptly by originals) each properly executed by a Responsible Officer of the signing Borrower, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the DIP Lender:

(i)    executed counterparts of this Agreement and all Collateral Documents;

(ii)    delivery to the DIP Lender of any certificated securities representing equity interests pledged to the DIP Lender pursuant to any pledge agreement;

(iii)    a Note executed by Borrowers in favor of the DIP Lender;

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Borrower as the DIP Lender may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Borrower is a party;

(v)    a certificate signed by a Responsible Officer of each of the Borrowers certifying that the conditions specified in *Section 4.2(a)* and *(b)* have been satisfied;

(vi)    evidence satisfactory to the DIP Lender that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect; and

(vii)    resignations in form and substance satisfactory to the DIP Lender signed (but undated) by each of the five directors designated or appointed by any Borrower of each property owner's or home owner's association with respect to the Project.

(b)    Each of the Interim Borrowing Order and the Cash Management Order shall have been entered, shall be in full force and effect, and shall not have been reversed, vacated or stayed, or modified without the prior written consent of the DIP Lender, and all other necessary consents and approvals to the transactions contemplated hereby shall have been obtained and shall be reasonably satisfactory to the DIP Lender.

(c)     The DIP Lender shall have received the initial Approved Budget which shall be in form and substance satisfactory to the DIP Lender.

(d)     All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with this Agreement (including, without limitation, the DIP Orders) shall be in form and substance reasonably satisfactory to the DIP Lender.

(e)     Receipt by the DIP Lender of an environmental indemnity agreement in form and substance acceptable to the DIP Lender executed by Borrowers and by Lynn Watkins, in his individual capacity, as to all environmental and permitting matters within his actual knowledge on the Closing Date.

(f)     Any fees required to be paid to the DIP Lender on or before the Closing Date shall have been paid (or shall be paid from the proceeds of the initial DIP Loan).

(g)     Borrowers shall have paid (or shall pay from the proceeds of the initial DIP Loan) all fees, charges and disbursements of counsel to the DIP Lender to the extent invoiced prior to or on the Closing Date, *plus* such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between Borrowers and the DIP Lender).

(h)     The Closing Date shall have occurred on or before _____ ___, 2010.

**4.2     Conditions to all DIP Loans.**  In addition to the satisfaction of the conditions in *Section 4.1*, the obligation of the DIP Lender to honor any Notice of Borrowing is subject to the following conditions precedent:

(a)     The representations and warranties of each Borrower contained in *Article V* or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the applicable Borrowing Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date.

(b)     No Default shall exist, or would result from any proposed DIP Loan or from the application of the proceeds thereof and the use of proceeds of such DIP Loan shall be consistent with the Approved Budget then in existence.

(c)     The DIP Lender shall have received a Notice of Borrowing in accordance with the requirements hereof.

(d)     If such DIP Loans occurs after _____ ___, 2010, the Final Borrowing Order shall have been entered and be effective immediately (but may not yet have become Final).

(e)     Completion of all filings, agreements and recordings necessary to provide the DIP Lender, with perfected liens and security interests in the collateral and of the priority

contemplated herein, including (without limitation) a control agreement with respect to each of the Borrowers' cash and securities accounts, other than any such accounts maintained with Compass Bank or any Affiliate thereof, in favor of the DIP Lender, in each case, in form and substance satisfactory to the DIP Lender; provided that, in the case of the initial DIP Loan, the delivery of control agreements shall not be required.

(f)     Satisfactory review by the DIP Lender of all motions, orders, and other pleadings or related documents to be filed or submitted to the Court in connection with this Agreement and the approval thereof.

(g)     The Borrowers shall have delivered to the DIP Lender and the DIP Lender shall have approved the Initial Approved Budget or, for DIP Loans other than the initial DIP Loan, the then current Approved Budget.

(h)     The DIP Lender shall have received evidence that all insurance required to be maintained under **Section 6.7** is in effect and that the DIP Lender is named as a loss payee (for casualty insurance) and an additional insured (for liability insurance).

Each Notice of Borrowing submitted by Borrower shall be deemed to be a representation and warranty that the conditions specified in this **Section** have been satisfied on and as of the applicable Borrowing Date.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Borrowers represent and warrant to the DIP Lender that:

**5.1     Existence, Qualification and Power; Compliance with Laws.** Each Borrower (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, and (d) is in compliance with all Laws; except in each case referred to in *clauses (b)(i), (c) or (d)*, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

**5.2     Authorization; No Contravention.** The execution, delivery and performance by each Borrower of each Loan Document to which such Person is party, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law.

**5.3     Governmental Authorization; Other Consents.** No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental

Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Borrower of this Agreement or any other Loan Document, other than the approval of the Bankruptcy Court.

**5.4    Binding Effect.**  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Borrower that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered and approved by the Bankruptcy Court will constitute, a legal, valid and binding obligation of such Borrower, enforceable against each Borrower that is party thereto in accordance with its terms.

**5.5    [Intentionally Omitted].**

**5.6    Ownership of Property; Liens.**  Each of the Borrowers has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Except for alcoholic beverage inventory, which is owned by Watkins Hospitality, LLC, and sold at the marina and the club under a concession agreement between HMOC, Ltd. and Watkins Hospitality, LLC, the Borrowers own all assets used in the operation and development of the Property (including the marina, club facilities and municipal utility district and TIRZ accounts receivables), and none of such assets are owned by any Affiliate of the Borrowers.

**5.7    Insurance.**  The properties of each Borrower are insured with financially sound and reputable insurance companies not Affiliates of Borrowers, in such amounts (after giving effect to any self-insurance compatible with the following standards), with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where Borrowers operates.

**5.8    Taxes.**  Except as set forth on Schedule 5.8, the Borrowers have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.  The Borrowers have provided to the DIP Lender a true and correct copy of the U.S. income tax return for 2008 and all schedules thereto, for each of the Borrowers.  There is no proposed tax assessment against any of the Borrowers that would, if made, have a Material Adverse Effect.

**5.9    ERISA Compliance.**

(a)    Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification.  Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding

waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)     There are no pending or, to the best knowledge of Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.   There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)     (i)  No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither of the Borrowers nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither of the Borrowers nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

**5.10    Subsidiaries.** As of the Closing Date, none of the Borrowers have any Subsidiaries or equity investments in any other corporation or entity other than those specifically disclosed in ***Schedule 5.10***.

**5.11    Margin Regulations; Investment Company Act.** No Borrower is engaged in, nor will engage in, principally or as one of its important activities, the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  None of Borrowers, any Person Controlling Borrowers, or any Subsidiary of any of the Borrowers is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

**5.12    Disclosure.** No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Borrower to the DIP Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided that*, with respect to projected financial information, each Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

**5.13    Compliance with Laws.** Each of the Borrowers is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.14    Intellectual Property; Licenses, Etc.** Each of the Borrowers own, or possess the right to use, all of the material trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person.   To the best knowledge of Borrowers, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by the Borrowers infringes upon any rights held by any other Person in a manner which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of Borrowers, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**5.15    Rights in Collateral; Priority of Liens.** Each Borrower owns the property granted by it as Collateral under the Collateral Documents, free and clear of any and all Liens in favor of third parties other than Permitted Liens.  Entry of the Interim Borrowing Order is sufficient to cause the Liens granted pursuant to the DIP Orders and the Collateral Documents to constitute valid and enforceable first, prior and perfected Liens on the Collateral in favor of the DIP Lender.

**5.16    System Compliance; Status of Construction** The storm and sanitary sewer system, water system, all mechanical systems of the Property and other parts of the improvements constituting the Project comply with all applicable environmental, pollution control and ecological laws, ordinances, rules and regulations, and all Governmental Authorities having jurisdiction of the Property have issued all necessary permits, licenses or other authorizations for the construction, occupancy, operation, and use of the improvements constituting the Project.  Except as set forth on *Schedule 5.16*, all amounts owed to contractors and other mechanics and materialmen who might otherwise be entitled to claim a mechanics' or materialmen's lien under applicable law have been paid in full.

**5.17    Utility Availability**. All utility and municipal services required for use of the Property as a residential subdivision, including, but not limited to, water supply, storm and sanitary sewer systems, gas electric and telephone facilities, are available for use and tap-on at all lots on the Property that have been platted (except for installation of underground power lines to Section 6 of the Project for a cost of approximately $90,000) and are available in sufficient amounts for the normal and intended use of the Property as a residential subdivision, and written permission has been obtained from the applicable utility companies or municipalities to connect the Property (and each lot comprising the residential subdivision) into each of said services.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as the DIP Lender shall have any Commitment hereunder, any Term Principal Amount or other Obligations hereunder shall remain unpaid or unsatisfied, Borrowers shall:

**6.1    Financial Reporting.** Deliver to the DIP Lender, in form and detail satisfactory to the DIP Lender:

(a)      as soon as available, but in any event within 20 days after the end of each of month, a balance sheet of each Borrower as at the end of such month, and the related statement of income or operations, for such month and for the portion of such Borrower's fiscal year then ended, prepared consistently with such Borrower's previous financial information, such financial statements for each Borrower to be certified by a Responsible Officer of such Borrower as fairly presenting the financial condition and results of operations of such Borrower;

(b)      no later than the [_____] day of each month, a pro forma rolling thirteen-week cash flow budget for the Borrowers on a consolidated and consolidating basis, which budget shall be prepared on a basis consistent with the Initial Approved Budget and be reasonably satisfactory to the DIP Lender and which shall (i) be updated to reflect the Borrowers current projections and results, and (ii) contain a reconciliation (on a week-by-week basis) of the actual results for the immediately preceding monthly period to the Approved Budget for such immediately preceding month and a detailed explanation of all material variances from such Approved Budget;

(c)      as soon as available, but in any event within 20 days after the end of each month, detailed information in form satisfactory to the DIP Lender with respect to lot sales, store sales, restaurant sales, marina occupancy and collection information and property owners' association past due receivables;

(d)      the Borrowers shall provide to the DIP Lender when prepared a true and correct copy of the U.S. income tax return for 2009 and each subsequent year, and all schedules thereto for each of the Borrowers;

(e)      promptly upon reasonable request by the DIP Lender, information and documents not otherwise required to be furnished under the Loan Documents respecting the business affairs, assets and liabilities of the Borrowers.

**6.2     Certificates; Other Information.**  Deliver to the DIP Lender, in form and detail satisfactory to the DIP Lender:

(a)      Within three (3) days after any request by the DIP Lender, copies of any detailed audit reports, management letters or recommendations submitted to the Borrowers or General Partner by independent accountants in connection with the accounts or books of Borrowers, or any audit of any of them; and

(b)      Within three (3) days after any request by the DIP Lender, such additional information regarding the business, financial or corporate affairs of Borrowers, or compliance with the terms of the Loan Documents, as the DIP Lender may from time to time reasonably request.

**6.3     Notices.**  Promptly notify the DIP Lender:

(a)      of the occurrence of any Default;

(b)      within five Business Days of any Borrower obtaining knowledge of any matter that has resulted or could reasonably be expected to result in (i) a material dilution of the value of the Collateral, or (ii) a Material Adverse Effect, including (x) breach or non-performance of, or any default under, a Contractual Obligation of Borrower or any Subsidiary; (y) any dispute, litigation, investigation, proceeding or suspension between Borrower or any Subsidiary and any Governmental Authority; or (z) unless the DIP Lender has received notice thereof in connection with the Chapter 11 Cases, the commencement of, or any material development in, any litigation or proceeding affecting Borrower or any Subsidiary, including pursuant to any applicable Environmental Laws;

(c)      of the occurrence of any ERISA Event;

(d)      concurrently with the occurrence of (i) such change, notify the DIP Lender of any change in the name, legal structure, place of business, or chief executive office of any Borrower, or (ii) any acquisition or creation of a Subsidiary by any Borrower, notify the DIP Lender that any Person has become a Subsidiary of such Borrower; and

(e)      of any material change in accounting policies or financial reporting practices by any Borrower.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer of each Borrower setting forth details of the occurrence referred to therein and stating what action Borrowers have taken and propose to take with respect thereto.  Each notice pursuant to **Section 6.3(a)** shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

**6.4      Payment of Obligations.**  Subject to the requirements of the Bankruptcy Code and in accordance with the Approved Budget, pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by Borrower; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; and (c) all Debt, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Debt.

**6.5      Preservation of Existence, etc.**  Subject to the requirements of the Bankruptcy Code, (a) preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

**6.6      Maintenance of Properties.**  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and

condition, ordinary wear and tear excepted; (b) make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; and (c) use the standard of care typical in the industry in the operation and maintenance of its facilities.

6.7 **Maintenance of Insurance.** Maintain with financially sound and reputable insurance companies not Affiliates of any Borrower, insurance with respect to the properties and business of the Borrowers against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance compatible with the following standards) as are customarily carried under similar circumstances by such other Persons and providing for not less than 30 days' prior notice to the DIP Lender of termination, lapse or cancellation of such insurance. Upon the next renewal, insurance premiums shall be paid for the following policy year.

6.8 **Compliance with Laws.** Subject to the requirements of the Bankruptcy Code, comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.9 **Books and Records.** (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with Borrower's past practices shall be made of all financial transactions and matters involving the assets and business of the Borrowers; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over any Borrower. Borrowers shall maintain at all times books and records pertaining to the Collateral in such detail, form and scope as the DIP Lender shall reasonably require.

6.10 **Inspection Rights and Field Audit.** Permit financial advisors, representatives and independent contractors of the DIP Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to Representative Borrower.

6.11 **Use of Proceeds.** Use the proceeds of the DIP Loans solely in accordance with the Approved Budget to pay expenses in the ordinary course of business.

6.12 **Collateral Records.** To execute and deliver promptly to the DIP Lender, from time to time, solely for the DIP Lender's convenience in maintaining a record of the Collateral, such written statements and schedules as the DIP Lender may reasonably require designating, identifying or describing the Collateral. The failure by Borrower, however, to promptly give the DIP Lender such statements or schedules shall not affect, diminish, modify or otherwise limit the Liens on the Collateral granted pursuant to the Collateral Documents.

**6.13   Security Interests and Collateral Assignments.** To (a) defend the Collateral against all claims and demands of all Persons at any time claiming the same or any interest therein, (b) comply with the requirements of all state and federal laws in order to grant to the DIP Lender valid and perfected first priority security interests in the Collateral, with perfection, in the case of any investment property, deposit account or letter of credit, being effected, if required by the DIP Lender, by giving the DIP Lender control of such investment property or deposit account or letter of credit, rather than by the filing of a Uniform Commercial Code ("*UCC*") financing statement with respect to such investment property, and (c) do whatever the DIP Lender may reasonably request, from time to time, to effect the purposes of this Agreement and the other Loan Documents, including filing notices of liens, UCC financing statements, fixture filings and amendments, renewals and continuations thereof; cooperating with the DIP Lender's representatives; keeping stock records; and, subject to the Bankruptcy Code and the Approved Budget, paying claims which might, if unpaid, become a Lien on the Collateral.  The DIP Lender is hereby authorized by the Borrowers to file any UCC financing statements covering the Collateral whether the Borrowers have independently authorized such filing.

**6.14   Cash Management.** The Borrowers will establish and maintain all of their respective banking depositor and disbursement relations in accordance with Orders of the Bankruptcy Court with respect to cash management.

**6.15   Further Assurances**.  Each Borrower will file and prosecute any and all motions, pleadings or other filings with the Bankruptcy Court (in each case in form and substance satisfactory to the DIP Lender), execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents and obtaining any consents from third parties as the DIP Lender deems appropriate), that may be required under any Applicable Law, or which the DIP Lender may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Borrowers.  The Borrowers shall also provide to the DIP Lenders originals of any and all documents related to the Property as the DIP Lender shall from time to time request.

**6.16   Appointment Rights**.  If requested by the DIP Lender, the Borrowers shall cause one Person designated by the DIP Lender to be designated or appointed as one of the Borrowers' designees to the board of directors of each homeowner's or property owner's association, provided that any Person so designated by the DIP Lender meets the necessary eligibility criteria for membership on any such board.  After the occurrence and during the continuance of an Event of Default, the DIP Lender shall be entitled, in the place and stead of the Borrowers, to exercise all the Borrowers' developer's rights with respect to the Project, any such association, any municipal utility district, TIRZ or other similar association or entity, including the right to appoint and to remove directors from the board of directors of any such association.  After the occurrence and during the continuance of an Event of Default, if so requested by the DIP Lender any or all of resignations that have been delivered pursuant to *Section 4.1(a)(vii)* shall become effective.  Without the prior written consent of the DIP Lender, the Borrowers will not take any action to amend or modify any agreement with any municipal utility district, any TIRZ or any property owners' or home owner's association or other similar entity or take any other action that would restrict, or result in a restriction upon the ability of the DIP Lender (or any purchaser

acquiring the Project from the DIP Lender in a foreclosure sale) to exercise those rights after the occurrence and during the continuance of an Event of Default or following a foreclosure by the DIP Lender.

### 6.17    Bankruptcy Related Affirmative Covenants.

(a)    Promptly provide the DIP Lender with updates of any developments in connection with the Borrowers' reorganization efforts under the Chapter 11 Cases, including any such developments in connection with the proposed sale of the Borrowers' assets, Borrowers' operations or otherwise.

(b)    Promptly, punctually, and faithfully perform all and singular the terms and conditions of the DIP Orders.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as the DIP Lender shall have any Commitment hereunder or any Term Principal Amount or other Obligations hereunder shall remain unpaid or unsatisfied, the Borrowers shall not, directly or indirectly:

### 7.1    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)    Liens existing on the Petition Date and described on *Schedule 7.1*;

(c)    Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted;

(d)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which either arise in connection with obligations incurred prior to the Petition Date or are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)    deposits to secure the performance of bids, trade contracts and leases (other than Debt), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; and

(g)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not

in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person.

**7.2    Investments.** Form any Subsidiary or make any other Investment (other than Investments in Borrowers) except:

(a)    Investments in the form of cash equivalents or short-term marketable debt securities subject to the Bankruptcy Court's orders and the United States Trustee guidelines;

(b)    to the extent consistent with the Approved Budget, Investments consisting of extensions of credit in the nature of accounts receivable arising from the grant of trade credit in the ordinary course of business.

**7.3    Debt.** Create, incur, assume or suffer to exist any Debt, except:

(a)    Debt under the Loan Documents; and

(b)    Debt, including Guarantees, outstanding on the Petition Date.

**7.4    Fundamental Changes.** Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

**7.5    Dispositions.** Make any Disposition or enter into any agreement to make any Disposition without the consent of the DIP Lender, except Dispositions of inventory in the ordinary course of business for fair market value and Dispositions the proceeds of which are sufficient to pay and discharge (and are actually used to pay and discharge) all the Obligations in full and in cash.

**7.6    Distributions.** Declare or make, directly or indirectly, any Distribution, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests.

**7.7    Change in Nature of Business.** Engage in any material line of business different from those lines of business conducted by the Borrowers on the date hereof.

**7.8    Transactions with Affiliates.** Enter into any transaction of any kind with any Affiliate of Borrower, whether or not in the ordinary course of business, other than those reflected in the Approved Budget and that are on fair and reasonable terms substantially as favorable to Borrowers as would be obtainable by Borrowers at the time in a comparable arm's length transaction with a Person other than an Affiliate, provided that the foregoing restriction shall not apply to transactions between or among Borrowers.

**7.9    [Intentionally Omitted].**

**7.10    Use of Proceeds.** Use the proceeds of any DIP Loan, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) except as expressly contemplated by the Approved Budget or (ii) to purchase or carry margin stock (within the

meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.  No part of the proceeds of any DIP Loan will be used, whether directly or indirectly:  (i) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to (a) the interests of the DIP Lender or their rights and remedies under this Agreement, the other Loan Documents or any of the DIP Orders, including, without limitation, for the payment of any services rendered by the professionals retained by the Borrowers or an official committee of unsecured creditors in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Liens securing same, (y) for monetary, injunctive or other affirmative relief against the DIP Lender or its Collateral, or (z) preventing, hindering or otherwise delaying the exercise by the DIP Lender of any rights and remedies under any of the DIP Orders, the Loan Documents or Applicable Law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by the DIP Lender upon any of its Collateral; (ii) to make any distribution under a plan of reorganization in the Chapter 11 Cases; (iii) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Lender; (iv) to pay any fees or similar amounts to any Person who has proposed or may propose to purchase interests in any Borrower without the prior written consent of the  DIP Lender

**7.11    Prepayment of Debt.** No Borrower may voluntarily prepay principal of, or interest on, any Debt, other than the Obligations.

**7.12    Bankruptcy Related Negative Covenants.** Except as permitted by this Agreement or any DIP Order, no Borrower will seek, consent to, or permit to exist any of the following:

(a)    Any modification, stay, vacation or amendment to the DIP Orders to which the DIP Lender has not consented in writing;

(b)    A priority claim or administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 or 1114 of the Bankruptcy Code) equal or superior to the priority claim of the DIP Lender in respect of the Obligations;

(c)    Any Lien on any Collateral having a priority equal or superior to the Lien securing the Obligations;

(d)    Any order which authorizes the return of any of the Borrowers' property pursuant to Section 546(h) of the Bankruptcy Code, provided that the foregoing shall not prohibit the Borrowers' return of any consigned inventory to consignors on such terms as are reasonably acceptable to the  DIP Lender;

(e)     Any order which authorizes the payment of any Debt incurred prior to the Petition Date without the prior consent of the  DIP Lender; or

(f)     Any order seeking authority to take any action that is prohibited by the terms of this Agreement or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement or any of the other Loan Documents.

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

**8.1     Events of Default.**  Any of the following shall constitute an Event of Default:

(a)     <u>Non-Payment</u>.  A Borrower fails to pay when due any amount of principal of, or any interest on, any DIP Loan, or any fee or other amount payable hereunder or under any other Loan Document; or

(b)     <u>Specific Covenants</u>. Borrower fails to perform or observe any term, covenant or agreement contained in ***Section 6.7, Section 6.10, Section 6.14*** or ***Article VII*** of this Agreement, or fails to perform or observe any other term, covenant or agreement contained in this Agreement which failure is not cured within 20 days; or

(c)     <u>Representations and Warranties</u>. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of a Borrower herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made; or

(d)     <u>Defaults under Post-Petition Agreements</u>. A default, breach or condition occurs under any agreement, document or instrument entered into by any Borrower Post-Petition that is not cured within any applicable grace period therefor, and such default or breach results in any material Debt incurred Post-Petition becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any such material Debt or any trustee or agent on its or their behalf to cause any such material Debt to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity, or cash collateral in respect thereof to be demanded; or

(e)     <u>DIP Order Modifications</u>. The entry of an order in the Chapter 11 Cases which stays, modifies (in any manner adverse to the DIP Lender), or reverses any DIP Order or which otherwise materially adversely affects, as determined by the DIP Lender in its reasonable discretion, the effectiveness of any DIP Order without the express written consent of the DIP Lender; or

(f)     <u>Appointment of Trustees, etc</u>. Either (i) the appointment in the Chapter 11 Cases of a trustee or of any examiner having expanded powers to operate all or any part of any Borrower's business, or (ii) the dismissal or conversion of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code; or

(g)     Judgments.  There is entered against any Borrower (i) a Post-Petition final judgment or order which requires the immediate payment of money in an aggregate amount exceeding $100,000 (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of 10 consecutive days during which a stay of enforcement of such judgment (pursuant to the Bankruptcy Code or otherwise), by reason of a pending appeal or otherwise, is not in effect; or

(h)     ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of a Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $100,000, or (ii) a Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $100,000; or

(i)     Invalidity of Loan Documents. Any Loan Document or any provision thereof at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Borrower contests in any manner the validity or enforceability of any Loan Document or any provision thereof; or any Borrower denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document or any provision thereof; or

(j)     Material Adverse Effect.  There occurs any event or circumstance that has a Material Adverse Effect; or.

(k)     Final Borrowing Order Entry. The failure of the Bankruptcy Court to enter a Final Borrowing Order, in form and substance satisfactory to the DIP Lender, by _____ ___, 2010; or

(l)     Automatic Stay Orders. The entry of any order (other than the DIP Orders) which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code which permits (i) any creditor to realize upon, or to exercise any right or remedy with respect to, any Collateral, (ii) any creditor to having a claim greater than $25,000 to realize upon, or to exercise any right or remedy in respect of any other asset of the Borrowers, or (iii) any creditor to terminate any license, franchise, or similar agreement, in each case, where the exercise of such right or remedy or such realization or termination would reasonably be likely to have a Material Adverse Event; or

(m)     Super-Priority Claims The filing of any application by any Borrower without the express prior written consent of the DIP Lender for the approval of (or the entry of any order approving) any super-priority claim in the Chapter 11 Cases which is *pari passu* with or senior to the priority of the claims of the DIP Lender for the Obligations, or there shall arise any such super-priority claim under the Bankruptcy Code; or

(n)  Payment of Pre-Petition Indebtedness.  The payment or other discharge by any Borrower of any Pre-Petition Indebtedness, except as expressly permitted hereunder, under any DIP Order or in the Approved Budget or by order in the Chapter 11 Cases to which order the DIP Lender has provided its written consent; or

(o)  Adequate Protection. The entry of any order in the Chapter 11 Cases which provides adequate protection, or the granting by any Borrower of similar relief in favor of any one or more of a Borrower's Pre-Petition creditors, contrary to the terms and conditions of any DIP Order or the terms hereof; or

(p)  DIP Order.  Entry of the Interim Borrowing Order shall not have occurred by January 29, 2010, entry of the Final Order shall not have occurred within 30 days after the entry of the Interim Borrowing Order or the failure of any Borrower to comply in all material respects with each and all of the terms and conditions of any DIP Order; or

(q)  Filing of Certain Other Motions. The filing of any motion by any Borrower  seeking, or the entry of any order in the Chapter 11 Cases:  (i) (A) permitting working capital or other financing (other than ordinary course trade credit, unsecured debt or Permitted Debt) for any Borrower from any Person other than the DIP Lender (unless the proceeds of such financing are used to pay in full all Obligations), and the establishment of a reserve account for all indemnification obligations hereunder), (B) granting a Lien on, or security interest in (other than a Permitted Lien) any of the Collateral, other than with respect to this Agreement (unless such Liens are granted in connection with a financing, the proceeds of which are applied to the payment in full of all Obligations and indemnification obligations hereunder), (C) except as permitted by this Agreement, permitting the use of any of the Collateral pursuant to Section 363(c) of the Bankruptcy Code without the prior written consent of the DIP Lender, (D) permitting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, (E) dismissing the Chapter 11 Cases, (F) attacking the validity or enforceability of any of the Loan Documents, the Liens securing the Obligations, the superpriority status of the DIP Lender's claims against the Borrowers or any of the DIP Lender's rights and remedies under the DIP Orders, the Loan Documents or any other order entered in the Chapter 11 Cases, or (G) that otherwise could reasonably be expected to impair materially the rights of the DIP Lender under this Agreement, or (ii) the filing of any motion by any Creditors' Committee appointed, or any other party in interest, in the Chapter 11 Case) seeking any of the matters specified in the foregoing clause (i) that is not dismissed or denied within the later of (x) the soonest available time for a hearing before the Bankruptcy Court seeking the dismissal of such motion, and (y) thirty (30) days of the date of the filing of such motion (or such later date agreed to in writing by the  DIP Lender); or

(r)  Cash Collateral Order.  Any default by any Credit Party under the terms of the cash collateral orders entered by the Bankruptcy Court; or

(s)  Plan Terms.  The filing of a motion by any Borrower seeking approval of a disclosure statement and a plan of reorganization, or the entry of an order confirming a plan of reorganization, that does not require repayment in full in cash of all Obligations on the consummation date of such plan of reorganization; or

(t)     <u>Budget Matters</u>. The making of any payments or the incurrence of expenses (individually or in the aggregate) on any line item in excess of 10% of the weekly budgeted amount for such line item listed in the Approved Budget for the relevant week, which is not cured within 5 days.  For removal of any doubt, all expenses previously budgeted in prior periods for a particular line item may be paid in any future period on a line item by line item basis; or

(u)     <u>Change of Control</u>.  The occurrence of a Change of Control.

**8.2     Remedies Upon Event of Default.** If any Event of Default occurs and is continuing, may take any or all of the following actions except as provided in the DIP Orders:

(a)     declare the commitment of the DIP Lender to make DIP Loans terminated, whereupon such commitments and obligation shall be terminated;

(b)     declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower; and

(c)     exercise all rights and remedies available to it and the DIP Lender under the Loan Documents as provided in the DIP Orders.

**8.3     Application of Funds.**  After the exercise of remedies provided for in ***Section 8.2*** (or after the DIP Loans have automatically become immediately due and payable), any amounts received on account of the Obligations shall be applied by  DIP Lender in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts payable to the DIP Lender (including fees, charges and disbursements of counsel to the DIP Lender (including fees and time charges for attorneys who may be employees of the DIP Lender) and amounts payable under ***Section 2.6*** and amounts payable under ***Article III***);

<u>Second</u>, to payment of accrued and unpaid interest on the DIP Loans;

<u>Third</u>, to payment of that portion of the Obligations under this Agreement constituting unpaid principal of the DIP Loans;

<u>Fourth</u>, to payment of any other Obligations then due and payable pursuant to the term of this Agreement or any other Loan Document;

<u>Fifth</u>, to establish a reserve in an amount established by the DIP Lender in its reasonable credit judgment with respect to all indemnities set forth in this Agreement; and

<u>Sixth</u>, the balance, if any, after all of the foregoing have been indefeasibly paid in full, to Borrowers or as otherwise required by Law.

**ARTICLE IX**
**MISCELLANEOUS**

**9.1     Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by a Borrower therefrom, shall be effective unless in writing signed by the DIP Lender and such Borrower, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**9.2     Notices; Effectiveness; Electronic Communications.**

(a)     <u>Notices Generally</u>. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in *subsection (b)* below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, to the address, telecopier number, electronic mail address or telephone number specified for such Person on **Schedule 9.2**.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).   Notices delivered through electronic communications to the extent provided in *subsection (b)* below, shall be effective as provided in such *subsection (b)*.

(b)     <u>Electronic Communications</u>. Notices and other communications to the Borrowers or to the DIP Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the DIP Lender and the Borrowers.   The DIP Lender or Borrowers may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.   Unless the DIP Lender otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing *clause (i)* of notification that such notice or communication is available and identifying the website address therefor.

(c)     <u>Change of Address, Etc</u>. Each of the Borrowers and the DIP Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties to this Agreement.

(d)     <u>Reliance by the DIP Lender</u>. The DIP Lender shall be entitled to rely and act upon any notices (including telephonic Notice of Borrowings) purportedly given by or on behalf of Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof; as understood by the recipient, varied from any confirmation thereof. Borrowers shall indemnify the DIP and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Borrower. All telephonic notices to and other telephonic communications with the DIP Lender may be recorded by the DIP Lender, and each of the parties to this Agreement hereby consents to such recording.

**9.3**     **No Waiver; Cumulative Remedies.** No failure by the DIP Lender to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

**9.4**     **Expenses; Indemnity; Damage Waiver.**

(a)     <u>Costs and Expenses</u>. Borrowers shall pay (i) all reasonable out-of-pocket expenses incurred by the DIP Lender and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the DIP Lender), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable fees and expenses of financial consultants to the DIP Lender in connection with the underwriting, management and administration of DIP Loans, (iii) all reasonable out-of-pocket expenses incurred by the DIP Lender (including the reasonable fees, charges and disbursements of counsel to the DIP Lender) incurred in connection with the Chapter 11 Cases, and (iv) all out-of-pocket expenses incurred by the DIP Lender (including the fees, charges and disbursements of any counsel for the DIP Lender), and shall pay all fees and time charges for attorneys who may be employees of the DIP Lender, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the DIP Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such DIP Loans. On the date the initial DIP Loan is made, the DIP Lender shall include a reserve of $10,000 against costs incurred and to be incurred by financial consultants to underwrite, manage and administer the IP Loans, and from time to time thereafter, the DIP Lender may make DIP Loans to pay any such costs and may, from time to time, establish such reserve as the DIP Lender deems appropriate with respect to further fees and expenses.

(b)     Indemnification by the Borrower. Borrowers shall indemnify the DIP Lender, and each Related Party (each such Person being called an "*Indemnitee*") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Borrowers arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties to this Agreement of their respective obligations hereunder or thereunder, or the consummation of the transactions contemplated hereby or thereby, (ii) any DIP Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrowers, or any Environmental Liability related in any way to the Borrowers, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower, and regardless of whether any Indemnitee is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNITEE; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)     Waiver of Consequential Damages. Etc. To the fullest extent permitted by applicable law, no Borrower shall assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any DIP Loan or the use of the proceeds thereof.   No Indemnitee referred to in *subsection (b)* above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d)     Payments. All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(e)     Survival. The agreements in this Section shall survive the replacement of the DIP Lender, the termination of the Commitment and the repayment, satisfaction or discharge of all the other Obligations.

**9.5     Payments Set Aside.** To the extent that any payment by or on behalf of a Borrower is made to the DIP Lender, or the DIP Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the DIP Lender in its discretion) to be repaid to a trustee, receiver or any other

party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**9.6     Successors and Assigns.**

(a)     Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the DIP Lender.

(b)     Assignments by the DIP Lender. The DIP Lender may at any time assign to any Person all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the DIP Loans at the time owing to it); *provided, however*, that in the event the DIP Lender proposes to assign its rights and obligations under this Agreement at any time prior to the Maturity Date, the DIP Lender shall give the Borrowers 30 days' prior written notice of its intent to make such assignment and shall give the Borrowers or their designee the right, during such 30-day period, to acquire the interest to be assigned without warranty or recourse for a purchase price equal to par value plus accrued interest and fees and the payment of all other obligations due hereunder to the date of assignment.  In the event the Borrowers or their designee fail to exercise such option and tender the purchase price during such 30-day period, the DIP Lender shall no longer be subject to any restriction on its right to assign its rights and obligations under this Agreement.

(c)     Participations. The DIP Lender may at any time, without the consent of, or notice to, Borrowers, sell participations to any Person (each, a "***Participant***") in all or a portion of the DIP Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the DIP Loans; provided that (i) the DIP Lender's obligations under this Agreement shall remain unchanged, (ii) the DIP Lender shall remain solely responsible to the other parties to this Agreement for the performance of such obligations and (iii) Borrowers shall continue to deal solely and directly with the DIP Lender in connection with the DIP Lender's rights and obligations under this Agreement.  Subject to *subsection (d)* of this Section, Borrowers agree that each Participant shall be entitled to the benefits of ***Sections 3.1, 3.2,*** and ***3.4*** to the same extent as if it were the DIP Lender and had acquired its interest by assignment pursuant to *subsection (b)* of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of ***Section 9.7*** as though it were the DIP Lender.

(d)     Limitations upon Participant Rights. A Participant shall not be entitled to receive any greater payment under ***Section 3.1*** or ***3.2*** than the DIP Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Borrower's prior written consent.

(e)     Certain Pledges. Any DIP Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such DIP Lender, including any pledge or assignment to secure

obligations to a Federal Reserve Bank; *provided that* no such pledge or assignment shall release such DIP Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such DIP Lender as a party to this Agreement.

**9.7     Right of Setoff.**  If an Event of Default shall have occurred and be continuing, the DIP Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the DIP Lender, or any such Affiliate to or for the credit or the account of Borrowers against any and all of the obligations of Borrowers now or hereafter existing under this Agreement or any other Loan Document to such DIP Lender or any such Affiliate, irrespective of whether or not such DIP Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of Borrowers may be contingent or unmatured.  The rights of the DIP Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that the DIP Lender and its Affiliates may have.  The DIP Lender agrees to notify Borrowers promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

**9.8     Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the Maximum Rate.  If the DIP Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the DIP Loans or, if it exceeds such unpaid principal, refunded to Borrowers.  In determining whether the interest contracted for, charged, or received by the DIP Lender exceeds the Maximum Rate, the DIP Lender may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**9.9     Counterparts; Integration; Effectiveness.**  This Agreement may be executed in counterparts (and by different parties to this Agreement in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in ***Section 4.1***, this Agreement shall become effective when counterparts hereof shall have been executed by Borrowers and the DIP Lender.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or portable document format (PDF) shall be effective as delivery of a manually executed counterpart of this Agreement.

**9.10     Survival of Representations and Warranties.**  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant to this Agreement or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the DIP Lender, regardless of any investigation made by the DIP Lender or on its behalf and notwithstanding that the DIP Lender may have had notice or knowledge of

1805427

42

any Default at the time of any DIP Loan, and shall continue in full force and effect as long as any DIP Loan or any other Obligations hereunder shall remain unpaid or unsatisfied or any Commitment remains outstanding.

**9.11     Severability.**  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.   The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.12     Governing Law; Jurisdiction; Etc.**

(a)      <u>GOVERNING LAW</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF TEXAS.

(b)      <u>Waiver Of Jury Trial</u>.  All disputes, claims and controversies between the undersigned, whether individual, joint, or class in nature, arising under this Agreement or any other Loan Document, including without limitation contract and tort disputes, shall be determined by the Bankruptcy Court.  The parties irrevocably and voluntarily waive any right they may have to a trial by jury in respect of any claim.  This provision is a material inducement for the parties entering into the Obligations and the other Loan Documents.

**9.13     USA PATRIOT Act Notice.**  The DIP Lender, to the extent it is subject to the Act (as hereinafter defined)  hereby notifies Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "***Act***"), it may be required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrowers and other information that will allow the DIP Lender to identify Borrowers in accordance with the Act.

**9.14     Representative Borrower.**  The Borrowers hereby irrevocably appoints Harborwalk to act on their behalf as Representative Borrower hereunder and under the other Loan Documents to request DIP Loans, to give and receive notices to the DIP Lender, to grant waivers or consent on behalf of Borrowers, and authorizes Representative Borrower to take such actions on its behalf and to exercise such powers as are delegated to Representative Borrower by the terms hereof and thereof; together with such actions and powers as are reasonably incidental thereto.

**9.15     Time of the Essence.**  Time is of the essence of the Loan Documents.

**9.16     No Oral Agreements.**  THE LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS BY THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

**9.17    Relationship with DIP Orders**.  In the event of any inconsistency between the terms of the DIP Orders and the Loan Documents, the terms of the DIP Orders shall control.

**9.18    Tax Matters**.   Given the complexity of the issues involved, to the extent permitted by law, the DIP Lender and the Borrowers shall each be responsible for reporting their own items of income and expense to the U.S. Internal Revenue Service and to any comparable state or local authority, and neither the DIP Lender nor the Borrowers shall endeavor to do so on behalf of the other.

**[Signature pages follow.]**

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be duly executed as of the date first above written.

HARBORWALK L.P.,
a Texas limited partnership

By: Its General Partner, Harborwalk GP, LLC, a Texas limited liability company

By: _____
      Name: _____
      Title: _____

HARBORWALK SALES CORPORATION,
a Texas corporation

By: _____
      Name: _____
      Title: _____

HARBORWALK MARINA OPERATING COMPANY, LTD.,
a Texas limited partnership

By: Its General Partner, Harborwalk Marina GP, LLC, a Texas limited liability company

By: _____
      Name: _____
      Title: _____

KLEIN EQUITIES, LLC,
a Texas limited liability company,
as DIP Lender


By: _____
      Name:  David Klein
      Title:  Member-Manager

*SCHEDULE 5.8*

**TAXES**

*SCHEDULE 5.10*

**SUBSIDIARIES
AND OTHER EQUITY INVESTMENTS**

*SCHEDULE 5.16*

**UNPAID AMOUNTS OWED TO CONTRACTORS AND
OTHER MECHANICS AND MATERIALMEN**

*SCHEDULE 7.1*

**LIENS EXISTING ON PETITION DATE**

*SCHEDULE 9.2*

**ADDRESSES FOR NOTICES**

**BORROWERS:**

**DIP LENDER:**

*EXHIBIT A*

## FORM OF NOTICE OF BORROWING

Date: _____, _____

To: _____ (the "**DIP Lender**")

Ladies and Gentlemen:

Reference is made to that certain Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of _____ __, 2010 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "**Agreement**"; the terms defined therein being used herein as therein defined), among Harborwalk, L.P., a Texas limited partnership, Harborwalk Sales Corporation, a Texas corporation, Harborwalk Marina Operating Company, Ltd., a Texas limited partnership (collectively, the "**Borrowers**"), and the DIP Lender from time to time party thereto.

The undersigned hereby requests a DIP Loan:

1.     On _____ (a Business Day).

2.     In the amount of $_____

The DIP Loan requested herein complies with **Section 2.1** of the Agreement and the applicable conditions set forth in **Article IV** of the Agreement have been satisfied.

HARBORWALK L.P.,
a Texas limited partnership

By: Its General Partner, Harborwalk GP, LLC, a Texas limited liability company

By: _____
    Name: _____
    Title: _____

HARBORWALK SALES CORPORATION,
a Texas corporation

By: _____
    Name: _____
    Title: _____

HARBORWALK MARINA OPERATING
COMPANY, LTD.,
a Texas limited partnership

By: Its General Partner, Harborwalk Marina GP,
LLC, a Texas limited liability company


By: _____
        Name: _____
        Title: _____

*EXHIBIT B*

### FORM OF TERM NOTE

$_____          _____

FOR VALUE RECEIVED, the undersigned (each a "***Borrower***" and collectively, the "***Borrowers***"), hereby promises to pay to _____ or registered assigns ("***DIP Lender***"), in accordance with the provisions of the Agreement (as hereinafter defined), the principal amount of each DIP Loan made by the DIP Lender to Borrowers under that certain Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of _____ __, 2010, (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "***Agreement***;" the terms defined therein being used herein as therein defined), among Borrowers and the DIP Lender.

Each Borrower promises to pay interest on the unpaid principal amount of each DIP Loan from the date of such DIP Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set out in the Agreement.

This Note is one of the Notes referred to in the Agreement, is entitled to the benefits thereof and may be prepaid in whole or in part subject to the terms and conditions provided therein. This Note is also entitled to the benefits of the Guaranties, if any, and is secured by the Collateral. Upon the occurrence and continuation of one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable all as provided in the Agreement. DIP Loans made by the DIP Lender shall be evidenced by this Note and by one or more loan accounts or records maintained by the DIP Lender in the ordinary course of business.

Each Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS.

HARBORWALK L.P.,
a Texas limited partnership

By: Its General Partner, Harborwalk GP, LLC, a Texas limited liability company

By: _____

      Name: _____

      Title: _____

HARBORWALK SALES CORPORATION,
a Texas corporation

By: _____

      Name: _____

      Title: _____

HARBORWALK MARINA OPERATING COMPANY, LTD.,
a Texas limited partnership

By: Its General Partner, Harborwalk Marina GP, LLC, a Texas limited liability company

By: _____

      Name: _____

      Title: _____