**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 11** |
| | § | |
| **HARBORWALK, LP;** | § | **Case No. 10-80043** |
| **HARBORWALK MARINA OPERATING** | § | **Case No. 10-80044** |
| **COMPANY, LTD.;** | § | |
| **HARBORWALK SALES CORPORATION** | § | **Case No. 10-80045** |
| | § | |
| **DEBTORS.** | § | **JOINT ADMINISTRATION** |
| | § | **REQUESTED** |

**DECLARATION OF EVAN WATKINS
<u>IN SUPPORT OF FIRST DAY MOTIONS</u>**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Evan Watkins, who, being duly sworn by me, did state as follows:

## I. INTRODUCTION

1.      My name is Evan Watkins.  I am the president of Harborwalk, LP and Harborwalk Sales Corporation ("<u>Harborwalk Sales</u>"), and the sole manager of the general partner of Harborwalk Marina Operating Company, Ltd. ("<u>Harborwalk Operating</u>", and together with Harborwalk, LP and Harborwalk Sales, the "Debtors").  I am familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2.      I submit this declaration (the "<u>Declaration</u>") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of the Bankruptcy Code filed on January 25, 2010 (the "<u>Petition Date</u>") and (ii) the relief, in the form of motions, that the Debtors have requested of the Court (the "<u>First Day</u>

Motions"). Any capitalized terms not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

3.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' management and other of the Debtors' advisors and employees, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4.     This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases. This Declaration describes the Debtors' businesses and the Debtors' debt, and summarizes the First Day Motions supported by this Declaration.

## II. DEBTORS' BUSINESSES

5.     The Debtors are engaged primarily in the business of developing and selling luxury residential real property (as a master-planned community) consisting of approximately 625 acres on the north shore of West Galveston Bay in Galveston County, Texas (the "Property" or the "Project"). The Property now offers luxury waterfront living and is composed of approximately 380 residential lots, a 150-slip marina, and a yacht club. The Debtors sell vacant lots to builders and individual buyers. Because the Property offers many recreational opportunities, it is particularly attractive to prospective buyers in the market for second homes.

6.     Harborwalk, LP is a limited partnership, with Harborwalk GP, LLC[1], a non-debtor, holding 1% as the general partner, and Harborwalk Investments, LLP[2], a non-debtor, holding 99% as limited partner.  Harborwalk LP owns the club, store, and marina at the Property.

7.     Harborwalk Sales is a wholly-owned subsidiary of Harborwalk, LP. Harborwalk Sales holds a license with the Texas Real Estate Commission and operates the developer sales and re-sales operation.

8.     Harborwalk Operating is a limited partnership with Harborwalk Marina GP, LLC[3], a non-debtor, holding 1% as the general partner, and Harborwalk LP holding 99% as the limited partner.  Harborwalk Operating operates the yacht club, store, and marina located on the Property.  Harborwalk LP owns these facilities and is obligated (as the limited partner of Harborwalk Operating), pursuant to the Harborwalk Operating limited partnership agreement, to make all cash contributions.

9.     Harborwalk LP was formed in 2002 to develop the Property, and it obtained a $12 million development loan (the "Development Loan") from Riverway Bank to begin funding the Project.  The Development Loan is secured by the Property.  From 2002 to 2007, the development of the Property proceeded generally in accordance with the plan and expectations of Harborwalk, LP. During this time, the development was modified on three occasions as Harborwalk, LP opened additional sections of the Property.   In 2006, the Development Loan was extended to $30 million.  During this period, Riverway Bank was acquired by Texas State Bank, which in turn was acquired in December 2007, by the Spanish

---

[1] Harborwalk GP, LLC is wholly owned by Harborwalk Investments, LLP. *See* footnote 2, *infra*.
[2] Harborwalk Investments, LLP is a general partnership electing to operate as a limited liability partnership with sixteen (16) partners.
[3] Harborwalk Marina GP, LLC is a limited liability company owned by Lynn, Evan, Alan, and Amy Watkins.

bank holding company BBVA.   BBVA has since begun operating as BBVA Compass ("Compass").

10.    Approximately 380 lots in the Property have been completed and approximately 275 lots in the Property have been sold since the Project's inception. However, in 2007 the real estate market began to suffer, and in 2008, lot sales slowed drastically.  At the same time, the Harborwalk, LP continued to incur expenses in connection with building the yacht club and marina on the Property.  The costs of these improvements coupled with low sales made it necessary for Harborwalk, LP to draw down all of the funds under the Development Loan.

11.    In anticipation of a long-term depression of real estate prices and demand, Harbowalk, LP and Compass reached an agreement whereby Harborwalk LP would contribute $10 million in equity to be used to reduce the principal amount of the Development Loan to $20 million.  In consideration of this equity contribution and pay-down, Harborwalk, LP requested that Compass (i) extend the Development Loan for five years; (ii) reduce the interest rate; and (iii) allow Harborwalk, LP to make draws on the loan up to a $30 million cap.  Harborwalk, LP communicated to Compass that its willingness to make such an equity contribution was contingent on these terms.  Compass accepted this offer and a refinancing on substantially these terms was close in June 2008.  At that time, Compass engaged an appraiser who opined that the fair market value of the Property collateralizing the Development Loan was $62 million.

12.    On September 10, 2008, the Property suffered substantial damage as a result of Hurricane Ike striking the Houston-Galveston area.  Although the physical damage to the

Property was quickly repaired, the effect of Hurricane Ike and the real estate exigency greatly depressed the market for the sale of the Property's individual lots.

13.     Since the re-financing in June 2008, Harborwalk, LP has complied with all terms contained in the Development Loan documents and has drawn approximately $7 million of the $10 million available.  All of these draws have been approved by Compass and the last draw was funded on December 4, 2009.[4]

14.     However, when Harborwalk, LP submitted a draw on December 7, 2009, Compass refused to fund the draw based on Compass' allegation that a "material adverse change" had occurred and that the Development Loan was in default because the Property had allegedly drastically declined in value since the refinancing in 2008.[5]

15.     As a result of Compass' refusal to fund the draw request, Harborwalk, LP has been forced to discontinue the bulk of the operations with regard to the Property.  On January 7, 2010, Harborwalk filed a complaint against Compass in the District Court of Galveston County, 10th Judicial District, Cause No. #10-CV-0023 (the "Compass Lawsuit").  As part of the Compass Lawsuit, Harborwalk, LP has asserted causes of action against Compass for breach of contract, breach of fiduciary duty and duty of good faith, fraud, and negligent misrepresentation.  Harborwalk, LP is seeking the recovery of all actual damages, punitive damages, interest, and attorneys' fees to the extent allowed by law.    Additionally,

---

[4] During the course of the development of the Property, Harborwalk, LP has advanced funds to Hitchcock TIRZ #1 and Flamingo Isles MUD of Galveston County to which it is entitled to reimbursement pursuant to certain terms and conditions.  As of January 7, 2010, the amount owed to Harborwalk, LP as reimbursement for the advances is $7.4 million and $19.3 million, respectively (these are face value amounts (i.e. not necessarily present value) and do not account for accrued interest).  The rights to these reimbursements are collaterally assigned to Compass as additional security for the Development Loan.

[5] The appraisal relied upon by Compass was performed by CB Richard Ellis and is dated September 21, 2009.  The appraisal opined that the value of the remaining parcels of the Property owned by Harborwalk, LP was $25.2 million.  The appraisal expressly excludes more than $26.7 million in receivables due and owing from TIRZ and MUD that are described in footnote 4, *supra*.

Harborwalk, LP is seeking cancellation of its debt and rescission of the Development Loan agreement as equitable remedies.

16.     Compass' refusal to fund the Development Loan pursuant to its 2008 terms has forced the Debtors to file for bankruptcy protection in order to obtain, through DIP Financing, the funds they need to continue operations and successfully emerge as reorganized entities.

17.     As of the Petition Date, the Debtors employed a total of six (6) contract employees.  Harborwalk Operating employs five (5) contract employees and Harborwalk Sales employs one (1) contract employee.  In the months prior to the bankruptcy filing, the Debtors slowed down, and to some extent shut down, portions of their business.  As a result, the Debtors laid off several of their employees.  However, with available DIP Financing, the Debtors intend to re-start most of their business operations and therefore plan on hiring additional employees.

### III.  ASSETS AND DEBT STRUCTURE

**Assets**

18.     Below is a description of the Debtors' assets and estimated asset values:

Land & lots
|  |  |
|---|---|
| Developed lot inventory | $11,547,600[6] |
| Raw land inventory | $14,500,000 |
| Total land & lots | $26,047,600 |

Commercial/recreational assets
|  |  |
|---|---|
| Harborwalk sales center (3750 sf a/c space) | $750,000 |
| Restaurant and clubhouse (7500 sf a/c space) | $1,500,000 |
| Store and office (4600 sf a/c space) | $920,000 |
| Marina slips (159 floating slips) | $2,385,000 |
| Maintenance building | $150,000 |
| Boat ramp and parking | $350,000 |
| Yacht club pool complex | $1,600,000 |

---

[6] This amount is 40% of the list price.

| | |
|---|---|
| Total commercial/recreational assets | $7,655,000 |
| | |
| Estimated public financing receivables | |
|     Zone receivables | $7,432,004 |
|     FIMUD receivables | $19,303,567[7] |
| Total estimated public financing receivables | $26,735,571 |
| | |
| TOTAL ESTIMATED ASSETS | $60,438,171 |

**Liabilities**

19.     As of the Petition Date, Harborwalk, LP was a party to the following credit facility and loan documents:

(a)     The Development Loan Agreement dated as of December 20, 2002, by and among Harborwalk, LP, as Borrower, and Texas State Bank, as Lender (as amended and restated from time to time, the "Development Loan").  BBVA Compass ("Compass") is the successor-in-interest to Texas State Bank.  The Development Loan is secured by the Property, and the Debtors believe that the amount outstanding under the Development Loan is approximately $30 million.

(b)     The Modification Agreement (the "Note") dated as of December 13, 2006, by and among Harborwalk, LP, as Maker, and Texas State Bank, as Payee, with principal amount of $30 million.  The Note is secured by the Property.

(c)     As security for the Note, Haborwalk, LP executed the following: (1) the Deed of Trust dated as of December 20, 2002, by and among Harborwalk, LP, as Grantor, and Texas State Bank, as Beneficiary; (2) the Assignment of Development and Financing Agreement dated as of December 20, 2002, by and among Harbowalk, LP, as Debtor, and Texas State Bank, as Secured Party; (3) the Assignment of Municipal Utility District Reimbursables dated as of May 14, 2003, by and among Harborwalk, LP, as Debtor, and Texas State Bank, as Secured Party; (4) the Deed of Trust dated as of March 18, 2005, by and among Harborwalk, LP, as Grantor, and Texas State Bank, as Beneficiary; (5) the Assignment of Contracts dated as of March 18, 2005, by and among Harborwalk, LP, as Grantor, and Texas State Bank, as Beneficiary; and (6) the Assignment of Leases dated as of March 18, 2005, by and among Harborwalk, LP, as Grantor, and Texas State Bank, as Beneficiary.

20.     The Debtors have approximately $574,000 in outstanding tax liability (Galveston County Tax Office and Flamingo Isles MUD Tax Assessor).  The Debtors also have approximately $1.616 million in unsecured debts.

---

[7] Face value amount, not discounted for present value.

## IV.  SUMMARY OF FIRST DAY MOTIONS

21.    **Debtors' Emergency Motion Pursuant to Bankruptcy Rule 1015 Requesting Joint Administration of Chapter 11 Cases (Dkt. No. 3).**   The Debtors Harborwalk Operating and Harborwalk Sales are affiliates of Harborwalk, LP, and joint administration of their chapter 11 cases will obviate the need to file duplicate motions, to enter duplicate orders, and to forward unnecessary, duplicate notices and other documents to creditors and other parties-in-interest, which would result in unnecessary costs and expenses that would be borne by the Debtors' estates.

22.    **Notice of Designation as Complex Chapter 11 Bankruptcy Cases (Dkt. No. 4).**  The Debtors have total debt of more than $10 million and there are more than fifty (50) parties-in-interest in these cases.

23.    **Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105, 362, 363, and 364 and Bankruptcy Rules 2002, 4001, and 9014 (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing, (II) Granting Security Interests and Superpriority Claims, and (III) Scheduling Final Hearing (Dkt. No. 9) (the "DIP Motion").**  Compass' refusal to fund the Development Loan pursuant to its terms has forced the Debtors to file for bankruptcy protection in order to obtain, through DIP Financing, the funds they need to continue operations and successfully emerge as reorganized entities.  The Debtors presently lack sufficient liquidity to support their operations.  The Debtors have thus concluded that they will require new post-petition financing to meet their ongoing working capital and general business needs while they continue the process of finalizing and seeking confirmation of a plan of reorganization.   Prior to the Petition Date, the Debtors communicated with several lenders with initial interest in funding post-petition financing.  The Debtors eventually entered into substantive discussions with Klein Equities, LLC (the

"DIP Lender") to obtain financing in the aggregate amount of $2.5 million (the "DIP Loan") under a debtor-in-possession financing facility (the "DIP Facility"), on the terms and conditions set forth in the executed Debtor-in-Possession Credit Agreement (the "DIP Agreement"), which is attached to the DIP Motion as Exhibit A (the DIP Agreement together with all agreements, documents and instruments delivered or executed in connection with the DIP Facility, the "DIP Documents").  I believe that these terms will reasonably address their near-term financing requirements and constitute the best financing option available to them given the circumstances of their business, their capital structure, and these Chapter 11 cases. A full description of the terms of the DIP Loan is provided in the DIP Motion and DIP Agreement.

24.     The Debtors currently believe that the value of the Property far exceeds the amount of the DIP Loan and the liens alleged by Compass.  A September 2009 appraisal of the Harborwalk Property opined that the value of the remaining parcels of the Harborwalk Property owned by Harborwalk, LP was $25.2 million.  The appraisal expressly excluded more than $26.7 million in receivables due and owing from TIRZ and MUD.  Thus, the value of the Harborwalk Property and the receivables combined provides a sufficient equity cushion for Compass and any other secured party (including taxing authorities) such that they are adequately protected.

25.     It is essential that the Debtors obtain financing necessary to continue, among other things, the orderly operation of the Debtors' businesses and these cases, and to otherwise satisfy their working capital requirements.  The DIP Loan also is essential to provide the Debtors' customers, members, employees, vendors and other key constituencies, with confidence in the Debtors' ability to administer these cases and conclude their

reorganization in a timely manner.  Without immediate access to new borrowing relief, the Debtors' business operations and these cases in general could grind to a halt, which would seriously jeopardize the going-concern value of the Debtors' assets.  The new liquidity offered by the proposed DIP Loan would ensure that the Debtors can maintain their assets and administer these cases through the next several months as the plan process ensues.  Thus, approval of borrowing under the DIP Agreement and eventual DIP Documents is necessary to prevent irreparable harm to the Debtors and the Debtors' estates.

26.     After appropriate investigation and analysis, the Debtors' management has concluded that the DIP Loan provides the best alternative available under the circumstances of these chapter 11 cases.

27.     **Debtors' Emergency Motion for Order (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (Dkt. No. 8).**  In connection with the operation of their businesses and management of their properties, the Debtors obtain electricity, gas, water, sewer, telephone, communications, and other similar services (collectively, the "Utility Services") from various utility companies (each, a "Utility Company" and collectively, the "Utility Companies").  Utility Services are essential to the continued operation of the Debtors' businesses and, consequently, to their reorganization efforts.

28.     The Debtors generally have had an excellent payment history with the Utility Companies, and there are no known material ongoing defaults or arrearages with respect to any Utility Service invoices.

29.     The Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner when they become due.  The Debtors expect that they will have sufficient cash to allow them to keep current on all such obligations.

30.     In addition, as a proposed adequate assurance payment, the Debtors propose to deposit with each Utility Company an amount which, in the Debtors' best estimation should be equal to approximately one month of Utility Services.  The proposed adequate assurance deposit amounts for each Utility Company are provided on Exhibit A to the Utility Motion.

31.     Uninterrupted utility service is critical to the Debtors' ability to operate and maintain the value of their businesses and to maximize value for the benefit of the creditors. The Debtors could not operate their businesses without utility service.  Should any Utility Company refuse or discontinue service, the Debtors would be forced to cease or limit operations.  Such an interruption would substantially disrupt operations and result in loss of revenues, which could irreparably harm and jeopardize the reorganization efforts or other objectives of the Debtors.

32.     **Debtors' Emergency Motion for Order (I) Authorizing Continued Use of Existing Forms and Records, (II) Authorizing Maintenance of Existing Corporate Bank Accounts and Cash Management System, and (III) Waiving the Requirements of 11 U.S.C. § 345(b) (Dkt. No. 7).**  Prior to commencing these cases, in the ordinary course of their businesses, the Debtors used a cash management system (the "Cash Management System") to efficiently collect, transfer, and disburse funds generated by their business operations.  The Debtors maintain the following accounts:

**Harborwalk, LP**
**Bank Accounts**

(a)  Account No.  xxxxx-379, at Texas First Bank (the "<u>HW LP Operating Account</u>")

(b)  Account No. xxxxx-338, at Compass Bank (the "<u>Compass Escrow Account</u>")[8]

**Harborwalk Operating**
**Bank Accounts**

(a)  Account No. xxxx-5333, at Compass Bank (the "<u>Membership Deposit Account</u>")[9]

(b)  Account No. xxxx-2341, at Texas First Bank (the "<u>Operating Account</u>")

(c)  Account No. xxxx-5341, at Compass Bank (Debtors intend to close this account)

**Harborwalk Sales**
**Bank Accounts**

Account No. xxxx-761, at Amegy Bank (the "<u>HW Sales Operating Account</u>")

33.    The Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other things, the ability to (i) control corporate funds, (ii) ensure the availability of funds when necessary, and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  Any disruption of the Cash Management System could have an adverse impact upon the Debtors' reorganization efforts.

34.    Also, the Debtors' operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from rigid compliance with the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtors in Possession

---

[8] This bank account was set up by Compass, and Harborwalk, LP is required to escrow in this account ten percent of any public financing receivables that are collected.  There are currently no funds in this account and Harborwalk, LP does not intend to use this account during its bankruptcy case.  The account will remain open to comply with Harborwalk, LP's obligations to Compass.

[9] The membership deposits for the Harborwalk Yacht Club are "escrowed" in this account.

and Trustees" (the "<u>Guidelines</u>"), which may require, as of the Petition Date, the closure of certain of the Debtors' pre-petition bank accounts, the opening of new accounts, and the immediate printing of new checks with the full name of the relevant debtor in possession exactly as it appears on the voluntary petition as well as "Debtor in Possession" and case number designation.

35.     The relief requested in this motion is vital to ensuring the Debtors' seamless transition into bankruptcy.  Authorizing the Debtors to maintain their Cash Management System, as modified, will avoid many of the possible disruptions and distractions that could divert the Debtors' attention from more pressing matters during the initial days of the chapter 11 case.  I believe that the relief requested in the cash management motion is in the best interests of the Debtors' estates and creditors and is both necessary and appropriate to the efficient administration of these chapter 11 cases and the Debtors' reorganization efforts.

36.     **Debtors' Emergency Motion for Order Authorizing Maintenance of Insurance Policies and Payment of Insurance Premiums (Dkt. No. 5).**  In connection with the operation of their businesses, the Debtors maintain various insurance policies (the "<u>Insurance Programs</u>") through several different insurance carriers (the "<u>Insurance Carriers</u>").

37.     Debtors' Insurance Programs include coverage for Automobile Liability, Property Insurance, Maritime Employers Liability, Flood Liability and Storage Tank Pollution Liability.  The Debtors also maintain Executives' and Directors' Liability Insurance (the "<u>E&O Insurance</u>") to indemnify their directors from claims brought against such individuals in their capacities as executives for the Debtors.

38.     The Debtors are required to pay premiums based upon a fixed rate established and billed by each Insurance Carrier.  The premiums for the most of these policies are

determined annually and are paid either directly to the Insurance Carrier and/or the Insurance Carrier's agent, or are financed through a third party (who has paid the Insurance Carrier). Harborwalk, LP pays its premium either directly to the insurance agent, Dean & Draper, or to the finance company Ideal Premium Finance, Inc.  As of the Petition Date, the outstanding premiums due for Harborwalk, LP total $8,278.23.  Harborwalk, LP requests authority to pay this pre-petition outstanding amount in order to maintain its insurance coverage.

39.    Harborwalk Operating pays all of its policies, excluding its Flood Policies, through First Insurance Funding, a premium finance company.  On January 20, 2010, Haborwalk Operating made a monthly payment of $15,086.00 to First Insurance Funding on account of all of Harborwalk Operating's insurance policies (excluding the Flood Policies). As of the Petition Date, Harborwalk Operating's only outstanding premium due is for its Fidelity Flood Policy in the amount of $12,387.00.  Harborwalk Operating requests authority to pay this pre-petition outstanding amount in order to maintain its insurance coverage.

40.    Finally, Harborwalk Sales maintains an Executive and Officers' Insurance (the "E&O Insurance") to indemnify their officers from claims brought against such individuals in their capacities as executives for the Debtors.  There are no pre-petition amounts outstanding under the E&O Insurance, and Harborwalk Sales requests authority to maintain its E&O Insurance post-petition.

41.    The Debtors must continue their Insurance Programs, which provide a comprehensive range of coverage for the Debtors and their business and properties, in full force and effect.  If these policies were allowed to lapse, the Debtors would be exposed to substantial liability for any damages resulting to persons and property of the Debtors and others.  Maintenance of the executives' and officers' liability policy also is necessary to the

retention of the Debtors' senior management who are critical to the success of the Debtors' business and reorganization. Therefore, it is necessary for the Debtors to maintain their insurance policies to prevent irreparable harm to the Debtors and their estates.

42. **Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and (II) Granting Authority to Establish the Master Service List Applicable to These Cases (Dkt. No. 6).** The Debtors request that certain notice and case management procedures (the "Procedures") govern in connection with the administration of these chapter 11 cases. These Procedures include, among other things, authority to (a) file a consolidated creditor matrix and (b) establish the master service list to be used in these cases.

43. Requiring each of the Debtors to file a separate creditor matrix in each of their respective cases would be unduly burdensome and would consume an excessive amount of the Debtors' scarce time and resources. Therefore, it is in the best interest of the Debtors' estates to avoid the cost and risks associated with preparing separate matrices. Accordingly, the Debtors submit that authority to file a single, consolidated creditor matrix in these cases is in the best interests of the estate and will facilitate the efficient and orderly administration of these cases.

44. Likewise, limiting notice to the parties described in the Procedures will minimize the burden and cost of service for the Debtors.

45.     **Debtors' Emergency Motion for Order (I) Authorizing Debtors to (A) Pay Pre-Petition Wages and Salaries to Employees and (B) Pay Pre-petition Benefits and to Continue Benefit Programs in the Ordinary Course and (II) Directing Banks to Honor Pre-petition Checks for Payment of Pre-petition Employee Obligations (Dkt. No. 10).** As of the Petition Date, the Debtors employed a total of six (6) contract employees. Harborwalk Operating and Harborwalk Sales hired these employees through Unique Staffing Solutions, LLC ("Unique"), a company specializing in providing temporary and long-term staffing.[10]  Harborwalk Operating employs five (5) contract employees through Unique and Harborwalk Sales employs one (1) contract employee through Unique.

46.     Instead of paying their employees directly, the Debtors make weekly lump-sum payments (typically every Thursday) to Unique on account of employee wages and other benefits that were earned by the employees during the previous week.[11]  Apart from these lump-sum payments to Unique, the Debtors also provide health insurance and retirement benefits for their contract employees.  The total amount of outstanding pre-petition Employee Claims for the Debtors' six employees are approximately $4,795.41 for Harborwalk Operating and $728.41 for Harborwalk Sales.  None of the Debtors' employees are owed pre-petition payments of more than $10,950.

47.     The Debtors pay for employee health insurance directly through the provider Humana, and employees have the option to pay for their dependants' health insurance along with dental and vision plans for themselves and their dependants.  The cost of the health insurance is approximately $400/month per employee.  All payments for health insurance (including payments for Harborwalk Sales employees) are drafted each month from the

---

[10] Harborwalk Operating and Harborwalk Sales have each entered into separate agreements with Unique for the purpose of hiring contract employees.

[11] Unique handles all federal and local tax withholding as well as workers compensation.

Harborwalk Operating bank account, and Harborwalk Sales subsequently reimburses Harborwalk Operating for the cost of health insurance for the Harborwalk Sales employees. As of the Petition Date, the health insurance for all employees has been paid through January 31, 2010. The next payment is due on February 10, 2010 and will cover the month of February 2010. The Debtors intend to continue to honor these health insurance benefits post-petition.

48.     With respect to retirement benefits, the Debtors offer an individual simple IRA plan that is administered by Edward D. Jones & Co., L.P. ("Edward Jones"). The Debtors' employees are able to contribute up to $11,500.00 per year of their paycheck to the plan, and the Debtor entity that employs them will match their contribution up to the first 3% of their salary. Contributions matched by the Debtors are paid directly to Edward Jones on a quarterly basis. As of the Petition Date, none of the employees have withheld IRA retirement plan contributions for the year 2010, and therefore the Debtors have no matching obligations as of the Petition Date. The Debtors intend to continue to honor these retirement benefits post-petition.

49.     Payment of the employee claims is necessary for the Debtors' effective reorganization. I believe that it is critical for employee productivity and stability that all employee wages remain current and be continued post-petition. If the employees' wages and reimbursements are not received in the ordinary course of business, employee morale will deteriorate, which, in turn, will substantially and adversely impact the Debtors' ability to complete a successful reorganization. Further, if the employee wages are not paid in the ordinary course of business, the employees will suffer personal hardship and in some cases will be unable to pay basic living expenses. This will hurt the employees, destabilize the

Debtors, and harm the Debtors' businesses and reorganization efforts. Any loss of employees would disrupt the Debtors' businesses and would deplete the value of the estates.

I declare under penalty of perjury that the foregoing is true and correct.

FURTHER, AFFIANT SAITH NOT.

AFFIANT:

Evan Watkins
Sole manager of the general partner of
Harborwalk Marina Operating Company,
Ltd. and the president of Harborwalk, LP
and Harborwalk Sales Corporation

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned authority, on the 22nd day of January, 2010.

My Commission Expires:

November 30, 2012

Notary Public - State of Texas

C. D. KINCAID
Printed Name of Notary Public

C. D. KINCAID
Notary Public, State of Texas
My Commission Expires
November 30, 2012